UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

RAJA'EE FATIHAH,

              Plaintiff,

      v.

CHAD NEAL (d.b.a. Save Yourself Survival and Tactical Gun Range) and NICOLE MAYHORN NEAL (d.b.a. Save Yourself Survival and Tactical Gun Range),

              Defendants.

No. 6:16-cv-00058-JHP

**DEFENDANTS' BRIEF IN SUPPORT OF MOTION
TO DISMISS AND/OR FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ........................................................................................................1

STATEMENT OF FACTS ..............................................................................................4

A.   Plaintiff Belongs to an Organization with Substantial Ties to Terrorism..........................4

B.   Plaintiff Came to Defendants' Range Armed with Military Weapons, a Recording Device, and an Agenda to Create a Disturbance and a Controversy..................................................6

C.   Defendants Do Not Have a Policy to Unlawfully Discriminate .......................................9

ARGUMENT ...........................................................................................................12

I.   Defendants' Gun Range Is Not a "Place of Public Accommodation"..............................12

II.   Defendants' Protected Speech Cannot Serve as a Basis for Civil Liability .....................16

III.   Plaintiff Cannot Establish a Standard Operating Procedure of Discrimination................17

IV.   Plaintiff Lacks Standing to Pursue His Claims...................................................18

V.   Plaintiff Failed to State a Claim under State Law and this Court Has No Jurisdiction to Hear this Claim because Plaintiff Failed to Exhaust His Statutory Remedies .................20

CONCLUSION...........................................................................................................21

CERTIFICATE OF SERVICE ..........................................................................................23

i

## TABLE OF AUTHORITIES

**Cases**

*Adickes v. Kress & Co.*,
   398 U.S. 144 (1970)...........................................................................................19

*Allen v. Wright*,
   468 U.S. 737 (1984)...........................................................................................19

*Atkinson v. Halliburton Co.*,
   905 P.2d 772 (Okla. 1995)..............................................................................20, 21

*Bray v. RHT, Inc.*,
   748 F. Supp. 3 (D.D.C. 1990)...........................................................................19

*Brooks v. Collis Foods, Inc.*,
   365 F. Supp. 2d 1342 (N.D. Ga. 2005)...............................................................19

*Carey v. Brown*,
   447 U.S. 455 (1980)...........................................................................................16

*City of L.A. v. Lyons*,
   461 U.S. 95 (1983).............................................................................................19

*Concord Rod & Gun Club, Inc. v. Mass. Com. Against Discrimination*,
   402 Mass. 716; 524 N.E.2d 1364 (1988)............................................................16

*Connick v. Myers*,
   461 U.S. 138 (1983)...........................................................................................16

*Daniel v. Paul*,
   395 U.S. 298 (1960)...........................................................................................15

*Denny v. Elizabeth Arden Salons, Inc.*,
   456 F.3d 427 (4th Cir. 2006) .........................................................................14, 15

*Durham v. Red Lake Fishing & Hunting Club, Inc.*,
   666 F. Supp. 954 (W.D. Tex. 1987)....................................................................16

*Evans v. Seaman*,
   452 F.2d 749 (5th Cir. 1971) .............................................................................16

*Int'l Bhd. of Teamsters v. United States*,
   431 U.S. 324 (1977)...........................................................................................17

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973)................................................................................18

*Miller v. Amusement Enters., Inc.*,
    391 F.2d 86 (5th Cir. 1967) ...............................................................14

*Miller v. Amusement Enters., Inc.*,
    394 F.2d 342 (5th Cir. 1968) ..............................................................16

*NAACP v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982)......................................................................16, 17

*Newman v. Piggie Park Enters., Inc.*,
    377 F.2d 433 (4th Cir. 1967) ..............................................................14

*Newman v. Piggie Park Enters., Inc.*,
    390 U.S. 400 (1968)............................................................................19

*Okla. Human Rights Comm'n v. Hotie*,
    505 P.2d 1320 (Okla. 1973) ...............................................................20

*Priddy v. Shopko Corp.*,
    918 F. Supp. 358 (D. Utah 1995) .......................................................14

*Scott v. Young*,
    421 F.2d 143 (4th Cir. 1970) ..............................................................16

*Smith v. YMCA of Montgomery, Inc.*,
    462 F.2d 634 (5th Cir. 1972) ..............................................................15

*Snyder v. Phelps*,
    562 U.S. 443 (2011)...................................................................2, 16, 17

*Susan B. Anthony List v. Driehaus*,
    134 S. Ct. 2334 (2014) .......................................................................18

*Tex. Dep't of Cmty. Affairs v. Burdine*,
    450 U.S. 248 (1981)............................................................................18

*Thatcher Enters. v. Cache Cnty. Corp.*,
    902 F.2d 1472 (10th Cir. 1990) ..........................................................20

*United States v. Cent. Carolina Bank & Trust Co.*,
    431 F.2d 972 (4th Cir. 1970) ..............................................................16

iii

*United States v. Greer*,
   939 F.2d 1076 (5th Cir. 1991) ................................................................15

*United States v. Holy Land Found. for Relief & Dev.*,
   No. 3:04-CR-0240-P (N.D. Dall. July 1, 2009) ......................................2

*United States v. Holy Land Found. for Relief & Dev.*,
   624 F.3d 685 (5th Cir. 2010) ..................................................................1

*United States v. Johnson*,
   390 U.S. 563 (1968)................................................................................19

*United States v. Lansdowne Swim Club*,
   894 F.2d 83 (3d Cir. 1990)......................................................................15

**Statutes**

28 U.S.C. § 1367(c)(3).................................................................................20

42 U.S.C. § 2000a ................................................................................ *passim*

Okla. Stat. tit. 25, § 1401 ......................................................................14, 16

Okla. Stat. tit. 25, § 1402 .............................................................................20

Okla. Stat. tit. 25, § 1502 .........................................................................20, 21

## INTRODUCTION[1]

This case should be summarily dismissed.  Plaintiff was not denied use of Defendants' gun range[2] based on any prohibited category or characteristic, including religion, and Defendants do not have a policy of restricting access to the gun range on the basis of religion (or any other prohibited category or characteristic).  This dangerous lawsuit,[3] which was contrived to create a controversy and a disturbance *at a gun range*, was promoted by the Council on American-Islamic Relations (CAIR), and its Oklahoma affiliate, CAIR-Oklahoma.  While Defendants' views on Islam—views which are supported by the many recent deadly attacks committed by self-proclaimed Islamic jihadists—might be considered politically incorrect, these views cannot serve as a basis for civil liability in this case under the First Amendment regardless of how Defendants express them, including on a sign posted at their business.  But that is precisely what Plaintiff is seeking to do here: to punish Defendants because they express the view that Islam is an existential threat to our local and national security.

On October 23, 2015, Plaintiff Raja'ee Fatihah, a board member for the Oklahoma chapter of CAIR—an organization that federal, state, and foreign governments acknowledge has ties to terrorism[4]—went to Defendants' gun range armed with a loaded (round in the chamber) military-

---

[1] Excerpts of Plaintiff Fatihah's deposition ("Fatihah Dep.") are attached as Exhibit A and the court reporter's errata is attached as Exhibit B to the Muise Declaration (Exhibit 1).  The deposition exhibits associated with Plaintiff Fatihah's deposition are attached as Exhibit C to the Muise Declaration.  Excerpts of Defendant Nicole Neal's deposition ("Nicole Dep.") are attached as Exhibit D to the Muise Declaration.  Excerpts of Mr. Adam Soltani's deposition ("Soltani Dep.") are attached as Exhibit E to the Muise Declaration.  The declaration of Defendant Nicole Neal ("Nicol Decl.") is attached as Exhibit 2.  And the declaration of attorney David Yerushalmi ("Yerushalmi Decl.") is attached as Exhibit 3.

[2] Defendant Nicole Neal is the sole owner of Save Yourself Survival and Tactical Gear and Gun Club, LLC, which is the business at issue.  The business is principally a retail establishment that sells survival and tactical gear; it also operates a small outdoor gun range.  (*See* Nicole Decl. ¶¶ 2, 3).  For ease of reference purposes only, the business will be referred to here as Defendants' gun range.

[3] Make no mistake, it is dangerous to intentionally create a disturbance and a controversy at a gun range, like Plaintiff has done here, where individuals are armed and wary of potential safety threats. (Nicole Decl. ¶ 29).

[4] The U.S. government identified CAIR as a Hamas-linked, Muslim Brotherhood front organization operating in the United States.  (*See, e.g.,* Nicole Decl. ¶ 43; Yerushalmi Decl. ¶¶ 2-17).  CAIR was an unindicted co-conspirator in the largest terrorism financing trial prosecuted by the federal government to date.  *See, e.g., United States v. Holy Land Found. for Relief & Dev.*, 624 F.3d 685, 688, 689 n.1 (5th Cir. 2010) (confirming that CAIR, among others, was included in

issue handgun strapped to his side, a military-style rifle slung over his shoulder,[5] magazines loaded with approximately 140 rounds of 9 mm ammunition, a concealed recording device in his pocket, and a dangerous agenda: to create a controversy with armed individuals at a gun range, hoping that he would *not* be allowed to fire his weapons so he could file this meritless lawsuit and run to the media with his pre-arranged "Islamophobia" narrative, knowing that the liberal media would willingly serve as an echo chamber for his spurious claim of discrimination.

At the end of the day, Plaintiff is asking this Court to silence public-issue speech that Plaintiff dislikes because it offends him as a Muslim.  But regardless of how offensive Plaintiff (or the media or even this Court) finds Defendants' speech, under the First Amendment, this speech cannot serve as a basis for civil liability.  *Snyder v. Phelps*, 562 U.S. 443 (2011).

Indeed, Plaintiff is attempting to convince the Court that it can, or should, force owners and operators of gun ranges to permit persons they believe to be safety threats, or worse, terrorists (or in this case, directly involved with an organization with ties to terrorism, and we refer here to CAIR and all of the evidence from government agencies demonstrating this fact) to train with weapons at their facilities.  But neither state nor federal law requires the owner of a gun range to train the next Chattanooga, Tennessee terrorist with dangerous firearms based on a claim that failing to do so constitutes unlawful religious discrimination.  And, as noted above, public issue speech, including speech which is critical of Islam and which might even deter Muslims from patronizing Defendants' business, is protected by the First Amendment and cannot serve as the basis for liability under any state or federal anti-discrimination law.  Such speech might harm the bottom line of the business, but it is still fully protected by the First Amendment.

Here, Plaintiff did not like a sign that Defendants posted outside of their store following the Islamic terrorist attack in Chattanooga, Tennessee, so he went to Defendants' business armed

---

the "List of Unindicted Co-conspirators and/or Joint Venturers" that was filed by the federal government in this criminal prosecution of a conspiracy to provide support to Hamas, a designated foreign terrorist organization); Mem. Op. Order at 14-19, *United States v. Holy Land Found. for Relief & Dev.*, No. 3:04-CR-0240-P (N.D. Dall. July 1, 2009), ECF No. 1356 (stating that "[t]he Government has produced ample evidence to establish the associations of CAIR, ISNA and NAIT with HLF, the Islamic Association for Palestine ('IAP'), and with Hamas" and reviewing the evidence); (Nicole Decl. ¶ 43, Ex. R [Memorandum Opinion Order]; Yerushalmi Decl. ¶ 8, Ex. D [Memorandum Opinion Order]).   CAIR-Ok is a direct affiliate of CAIR national, and it affirmatively agrees to "operate within the mission of CAIR."  (Soltani Dep. at 74).  The FBI has also severed ties with CAIR-Oklahoma.  (Nicole Decl. ¶ 43; Yerushalmi Decl. ¶¶ 12, 15).
[5] It is a disputed fact as to whether the rifle had a magazine inserted at the time.

with weapons, a concealed recording device, and an agenda to create a controversy and a disturbance in order to be denied use of the gun range so he could file this lawsuit.

Even apart from the grave First Amendment implications of this lawsuit, Defendants' gun range is not subject to the proscriptions of Title II or the Oklahoma anti-discrimination law in the first instance. This is evident by the detailed list of establishments that qualify as a "place of public accommodation" under federal law, thus excluding from coverage those categories of establishments, such as Defendants' gun range, that do not fall within Title II's comprehensive statutory framework. Public policy further supports this conclusion, as discussed further below. And Defendants' gun range is excluded by the express language of the Oklahoma statute, which *broadly* excludes any business that could be considered an "amusement establishment." Thus, given the very different statutory approaches to the issue of what constitutes a place of public accommodation, it is appropriate to conclude that the gun range at issue does not fall within the statutory frameworks of either Title II or Oklahoma law.

Additionally, and directly to the point of Plaintiff's allegations, the evidence shows that Defendants *never* inquired as to Plaintiff's religion when he visited the gun range—indeed, as a matter of course and as a matter of fact, Defendants *never* inquire as to *any* customer's religion. It was clear that Plaintiff was a Muslim when he completed his paperwork and signed the logbook (***Fatihah*** is unmistakably a Muslim name). And it wasn't until Plaintiff decided to create a controversy about his religion and assumed a threatening, armed stance that Defendants became concerned about Plaintiff firing at the range that day. Defendants knew at that moment that Plaintiff came to their range with an agenda—an agenda to create a disturbance and a controversy (why else conceal a recording device?). And even then, Defendants considered the possibility of allowing Plaintiff to fire his weapons that day, so long as extra safety precautions were taken (*i.e.*, that both Defendants Nicole and Chad Neal would supervise his firing as range safety officers). This alone demonstrates that Defendants do not have a blanket policy of prohibiting service to a potential customer based solely on the customer's religion. As the discussion continued and the tension mounted, however, Defendants ultimately decided to invoke the posted range rule (Rule 10) stating that all memberships were subject to board approval so that Defendants could ease the tension, take a pause, and conduct a background check of Plaintiff. And this background check confirmed their suspicions and concerns: Plaintiff was associated with an organization (CAIR) that has strong ties to terrorism and one that was looking for a controversy to file a lawsuit.

- 3 -

Finally, Plaintiff has no basis for relief in this case.  As an initial matter, Plaintiff has failed to sue the company, Save Yourself Survival and Tactical Gear and Gun Club, LLC.  Nonetheless, Plaintiff cannot show that the official policy of the gun range violates any federal or state law.  And while this policy was codified as part of the operating agreement of the company, its proscriptions applied prior to that, and it was the application of this public safety policy that was the basis for Defendants' decision to deny Plaintiff's application.  Plaintiff, a board member of CAIR-Oklahoma, an organization with strong ties to terrorism, is disqualified from using the range.  Anyone with ties to CAIR (a non-religious organization)—whether a Muslim, a Christian, an atheist, or an agnostic—is prohibited from firing at Defendants' gun range.  Thus, not only is there no violation of Title II, Plaintiff cannot establish standing to sue in this case because there is no basis for prospective relief (the only relief available under Title II).  Moreover, Plaintiff has failed to exhaust his statutory remedies under Oklahoma law, a jurisdictional prerequisite for bringing an action in court.  For this reason alone, his state law claim must be dismissed.

In conclusion, Plaintiff is asking this Court to establish a dangerous (and unconstitutional per the First Amendment) precedent that will have a chilling effect upon owners of gun ranges who must vigilantly safeguard against potential terrorists using their ranges to train for their next deadly attack.  In short, this case is not at all about religious discrimination; it is about public safety and the right to free speech.  It should be summarily dismissed.

## STATEMENT OF FACTS

**A.     Plaintiff Belongs to an Organization with Substantial Ties to Terrorism.**

1.      Plaintiff Raja'ee Fatihah ("Plaintiff") is a self-proclaimed, sharia-adherent Muslim.  (Fatihah Dep. at 7:15-25 to 8:1-9).

2.      "Fatihah" is a Muslim name—it is the name of the opening book of the Quran and of the opening prayer said by Muslims.  (Fatihah Dep. at 5:21-25-6:1-20).

3.      Plaintiff is a board member of the Oklahoma chapter of the Council on American-Islamic Relations ("CAIR").  (Fatihah Dep. 14:25 to 15:1-2).

4.      CAIR-Oklahoma is an affiliate of CAIR.  (Fatihah Dep. 19:23-25 to 21:1-6, Dep. Ex. 3 [CAIR-Ok Annual Report]; Soltani Dep. 20:13-15).

5.      As an affiliate of CAIR, CAIR-Oklahoma must "operate within the mission of CAIR."  (Soltani Dep. at 74).

6.      CAIR is _not_ a religious organization.  (Soltani Dep. at 13:20-22).

- 4 -

7.      You do not have to be Muslim to work at CAIR or any of its affiliates.  (Soltani Dep. at 13:23-25; *see also* Nicole Decl. ¶ 26).

8.      CAIR was an unindicted co-conspirator in a terrorism financing trial prosecuted by the U.S. Government.  (Nicole Decl. ¶ 43; Yerushalmi Decl. ¶¶ 3-8).

9.      The executive director of CAIR is Nihad Awad.  (Soltani at 20-21).

10.     Nihad Awad is a personal friend of the executive director of CAIR-Oklahoma, Mr. Adam Soltani.  (Soltani at 20-21)

11.     Nihad Awad was present at a meeting of Hamas supporters in Philadelphia in October 1993 that was surveilled by the FBI.  (Nicole Decl. ¶ 43; Yerushalmi Decl. ¶¶ 9-11).

12.     An objective of the Philadelphia meeting was to create organizations such as CAIR. (Nicole Decl. ¶ 43; Yerushalmi Decl. ¶¶ 9-11).

13.     In August 2015, Nihad Awad publicly threatened legal action against Defendants for posting their "Muslim Free" sign.  (Nicole Decl. ¶ 18).

14.     During the Holy Land Foundation ("HLF") criminal trial, the U.S. Government produced ample evidence to establish the associations of CAIR, ISNA and NAIT with HLF, the Islamic Association for Palestine ("IAP"), and with Hamas.  (Nicole Decl. ¶ 43; Yerushalmi Decl. ¶ 8).

15.     Hamas has been officially designated by the U.S. Government as a terrorist organization.  (Nicole Decl. ¶ 43; Yerushalmi Decl. ¶ 14).

16.     The United Arab Emirates has officially designated CAIR a terrorist organization. (Nicole Decl. ¶ 43; Yerushalmi Decl. 18).

17.     Due to CAIR's ties to Hamas and the Muslim Brotherhood, the FBI has severed outreach activities with CAIR, including its affiliates such as CAIR-Oklahoma.  (Nicole Decl. ¶ 43; Yerushalmi Decl. ¶¶ 12, 13).

18.     The Louisiana House of Representatives passed a resolution "urg[ing] and request[ing] law enforcement and governmental agencies in Louisiana to avoid and suspend all contacts and outreach activities with the Council on American Islamic Relations (CAIR)."  (Nicole Decl. ¶ 43; Yerushalmi Decl. ¶ 17).

19.     The Louisiana resolution set forth the factual basis for the resolution, including the following:

- The Federal Bureau of Investigation has suspended all formal contacts with CAIR due to evidence indicating a relationship between CAIR and Hamas, a designated foreign terrorist organization;

- One of CAIR's directors was sentenced to a year in federal prison for violating U.S. sanctions against Iraq;

- A CAIR director in Virginia pled guilty to terrorism-related financial and conspiracy charges, which resulted in a federal prison sentence;

- A communications specialist and civil rights coordinator for CAIR trained with an al Qaeda-tied Kashmir organization that is listed on the Department of State's international terror list and was also indicted on charges of conspiring to help al Qaeda and the Taliban battle American troops in Afghanistan and was sentenced to twenty years in prison;

- CAIR's former community affairs director pled guilty to three federal counts of bank and visa fraud and agreed to be deported to Egypt after he had funneled money to activities supporting terrorism and had published material advocating suicide attacks against the United States; these illegal activities took place while he was employed by CAIR;

- A CAIR fund raiser was arrested on terrorism-related charges and was deported from the United States due to his work as executive director of the Global Relief Foundation, which was designated as a fundraising front organization for a foreign terrorist organization by the U.S. Treasury Department for financing al Qaeda and other terrorist organizations;

- CAIR opened its first office in Washington, D.C., with the help of a grant from the Holy Land Foundation;

- The federal case against the Holy Land Foundation, a charitable organization that was shut down by the United States Department of the Treasury for funding Jihadist terrorist organizations, was the largest successful terrorism financing prosecution in U.S. history, and the case identified CAIR as a Muslim Brotherhood front group, and CAIR was named an unindicted co-conspirator in the trial; and

- The cofounder of CAIR's parent organization, Islamic Association for Palestine, was sentenced to prison on terrorism charges for financing Palestinian Islamic Jihad, a designated terrorist organization.

(Nicole Decl. ¶ 43; Yerushalmi Decl. ¶ 17).

20.     The concern about CAIR's ties to terrorism has bi-partisan support in Congress.

(Nicole Decl. ¶ 43; Yerushalmi Decl. ¶¶ 16, 21).

**B.     Plaintiff Came to Defendants' Range Armed with Military Weapons, a Recording Device, and an Agenda to Create a Disturbance and a Controversy.**

21.     On October 23, 2015, Plaintiff visited Defendants' gun range for the first time, arriving at approximately 9 am.  (Fatihah Dep. 50:9-20; 52:19-25 to 53:1-4).

22.     Plaintiff resides in the Tulsa, Oklahoma area, and did so on October 23, 2015. (Fatihah Dep. at 43:7-9).

23.     There are gun ranges in the Tulsa, Oklahoma area that are closer for Plaintiff to use than to travel approximately an hour to Oktaha to use Defendants' gun range. (Fatihah Dep. at 41:18-25 to 46:1-17; 52:19-24; *see also* 121:19-21).

24.     Plaintiff came to Defendants' gun range with an agenda beyond just shooting. (Fatihah Dep. at 54:6-13 [describing his reason for bringing a concealed recording device]; 50:21-25 to 51:1 [admitting that he received advice from a CAIR lawyer before going to the range]; 81:11-21 [admitting that he sent the recording to a CAIR lawyer]).

25.     Prior to his visit to the range, Plaintiff convinced his friend, Kenneth Harper, to visit Defendants' gun range so that Mr. Harper could investigate it before Plaintiff's planned visit. (Fatihah Dep. 75:22-25 to 77:1-8).

26.     On October 23, 2015, Plaintiff came to Defendants' gun range dressed in military-style clothing (black Army jacket) and carrying a loaded military-issue handgun strapped to his belt, a military-style rifle slung over his shoulder, fully loaded magazines with over 140 rounds of 9 mm ammunition, and a concealed recording device he kept in his pocket. (Fatihah Dep. 54:14-25 to 58:1-24; 60:12-25; 117:17-23, Dep. Ex. 12).

27.     Plaintiff came to Defendants' gun range without eye protection or hearing protection, which are required for shooting at gun ranges. (Fatihah Dep. 60:12-20; 64:17-25 to 65:1-16; Nicole Decl. ¶ 36).

28.     When Plaintiff visited Defendants' gun range—which is an outdoor range that employs paper targets—the range was sloppy and wet from rain. (Nicole Decl. ¶ 30; *see also* Fatihah Dep. at 90:17 [Recording informing Plaintiff that the range is "sloggy"]).

29.     Plaintiff was the only customer at the gun range that morning when he arrived. (Fatihah Dep. at 91:13-20; Nicole Decl. ¶ 30).

30.     Plaintiff did not see Defendants' "Muslim Free" sign posted when he visited Defendants' gun range on October 23, 2015. (Fatihah Dep. at 62:20-25 to 63:1).

31.     Upon arriving at the gun range, Plaintiff was greeted by Nicole Neal, and he completed the standard range paperwork, which included providing his name, ***Raja'ee Fatihah***, which is a Muslim name. (Nicole Decl. ¶¶ 34, 35; *see also* Fatihah Dep. at 5:21-25 to 6:1-20; 63:2-25 to 64:1-20, Dep. Exs. 13, 14).

- 7 -

32.     While Defendants never inquired into Plaintiff's religion, out of the blue, Plaintiff declared, "I am Muslim.  Is that going to be a problem?" or words to that effect.  (Nicole Dep. at 88:11-12; Nicole Decl. ¶¶ 9, 38; *see also* Fatihah Dep. 94:14-1 [Recording]).

33.     Upon hearing Plaintiff's declaration, Defendant Chad Neal, who was getting ready for the day, immediately recognized what was happening and shouted from the back room, "Wow. He just came in here with an agenda."  (Fatihah Dep. at 94:20-2; Reporter errata [Ex. B]; Nicole Decl. ¶ 38).

34.     Moments after declaring himself a Muslim, Plaintiff assumed a threatening stance (he dropped his right foot back and reached back with his right hand/arm—which is a stance a person would take if he were planning on engaging someone with a firearm).  (Nicole Dep. at 69:1-23; 84:10-11, 20-23; 89:12-16, 8-90; Nicole Decl. ¶ 38).

35.     The rustling noise made by Plaintiff's movement when he assumed his threatening stance can be heard on the secret recording made by Plaintiff on October 23, 2015.  (Nicole Decl. ¶¶ 38, 39).

36.     Plaintiff wore his handgun in a concealed position (under his jacket), but when he assumed the threatening stance, his handgun was revealed to Defendants.  (Nicole Decl. ¶ 38; Nicole Dep. at 49:7-22).

37.     When Plaintiff assumed his threatening stance, it appeared to Defendant Nicole Neal that he had a magazine inserted in his rifle.[6]  (Nicole Decl. ¶ 38; *see also* Nicole Dep. at 50:23-25 to 51:1-2).

38.     While at the range, Plaintiff challenged Defendants' views on Islam.  (Nicole Decl. ¶ 40; Fatihah Dep. at 94:14-25 to 100:1-10 [Recording]).

39.     Plaintiff admits that there are "people who engage in acts of violence and attribute it to their understand (sic) of Islam."  (Fatihah Dep. at 102:13-16; *see also* 108:2-25 to 109:2-6; 22-25; 110:6-8, 19-21; 111:5-10, 13-22; 112:8-11; 113:2-7).

40.     At one point, Defendant Nicole Neal suggested that both she and Defendant Chad Neal accompany Plaintiff to the range because they weren't comfortable with just one of them going since they had received threats on account of their sign.  (Fatihah Dep. at 71:4-25 to 72:1-8; *see also* Nicole Decl. ¶ 40).

---

[6] As noted, it is a disputed fact as to whether a magazine was inserted in Plaintiff's rifle at the time.

41.     On October 23, 2015, Defendant Nicole Neal told Plaintiff, "We've been a target from Muslims just because of our sign.  We put up the sign after the Chattanooga attack."  (Fatihah Dep. at 96:8-9 [Recording]).

42.     Plaintiff testified that he was "fine with both of them going out with [him]." (Fatihah Dep. at 71:19-20).

43.     Plaintiff (and CAIR) went to the press upon filing this lawsuit, and Plaintiff prepared an article for publication in the *Huffington Post* prior to filing the lawsuit.  (Fatihah Dep. at 25:20-25 to 26:1-21, Exs. 5, 8; 26:22-25 to 30:1-7, Exs. 9, 10).

**C.     Defendants Do Not Have a Policy to Unlawfully Discriminate.**

44.     Defendant Nicole Neal is the sole owner and manager of Save Yourself Survival And Tactical Gear And Gun Club, LLC, and Defendant Chad Neal, a fully disabled Iraq war veteran, works as a volunteer.  (Nicole Decl. ¶¶ 2, 4, 5).

45.     Defendant Nicole Neal's business is principally a retail establishment that sells survival and tactical gear.  It also operates a small outdoor gun range, which includes a covered location to fire handguns and an area to fire rifles.  (Nicole Decl. ¶ 3).

46.     The business is a small, "mom and pop" operation.  (Nicole Decl. ¶ 4).

47.     In February 2016, the business was incorporated and is now an Oklahoma limited liability company operating as Save Yourself Survival And Tactical Gear And Gun Club, LLC. (Nicole Decl. ¶ 2).

48.     Defendants have never had a policy of discriminating against anyone on the basis of religion, or any other prohibited category.  (Nicole Decl. ¶¶ 19-21; *see also* Fatihah Dep. at 70:21 ["***Nicole did not inquire about my faith***."] [emphasis added]; 68:10-25 to 69:1-7 [admitting that none of the paperwork, including the Gun Range Rules, required a customer to disclose his or her religion], Dep. Exs. 13, 14, 15, 18).

49.     Defendants' official policy (Gun Range Rule 11), which was always in practice but codified when the business was incorporated, provides as follows:

The following public safety policy applies to all shooters:

It is and always has been the policy of Save Yourself Survival And Tactical Gear And Gun Club, LLC (hereinafter "Gun Club") to comply with all federal, state, and local laws, including such laws that prohibit unlawful discrimination.  However, because the Gun Club is engaged in an inherently dangerous business—the use of firearms—the safety of its customers, its employees, and the community is paramount.  The Gun Club firmly resolves that it will not arm, equip, or train

anyone it believes to be a threat to public safety.  The Gun Club has that right, and it intends to exercise that right for the good of public safety.  Consistent with this policy, the Gun Club will not serve:
(a) Anyone who is either directly or indirectly associated with terrorism in any way;
(b) Anyone associated in any way with an organization that is associated with terrorism;
(c) Anyone who causes, or seeks to cause, any disturbance whatsoever at the Gun Club;
(d) Anyone who is not permitted to purchase or possess a firearm under any local, state, or federal guideline;
(e) Anyone who seeks to do harm to the interests of the United States;
(f) Anyone, in the sole judgment of the Gun Club, its owners, its employees, or its volunteers, who may pose a threat to public safety based on the person's behavior, comments, history, dress, background, or other such indicia indicating that the person may be a threat to public safety.  This judgment will not be based solely upon a person's race, color, religion, or sex.

(Nicole Decl. ¶ 21, Dep. Ex. 18).

50.    Plaintiff was not permitted to shoot at Defendant's gun range based on this public safety policy.  (Nicole Decl. ¶¶ 19-45).

51.    Shortly after posting the "Muslim Free" sign, on **August 19, 2015**, Defendant Nicole Neal published an "official statement" on Facebook stating, in relevant part:

No person has ever been turned away from Save Yourself Survival And Tactical Store for discrimination of any kind.  People's (sic) of every race, and religion are welcome at our store so long as our safety rules, and our store policies are observed.  Safety of our customers, staff and community is our primary concern . . .  Hateful behavior of any kind by anyone will not be tolerated period. . . .  Members found guilty of discrimination will be asked to leave the property immediately, their club membership will be revoked (without refund), and they will be banned from our establishment for life. . . .  We do stand by, and defend our policy not to allow radical, or extremists persons, groups, or establishments to do business at our establishment. . . .

(Nicole Decl. ¶ 19).

52.    Plaintiff's actions on October 23, 2015 (*i.e.*, his confrontational, suspicious, and threatening behavior) caused safety concerns for Defendants so they invoked Gun Range Rule 10, which was posted and provides that "All memberships are subject to board review and approval." (Nicole Decl. ¶¶ 6-9, 27-40).

53.    Gun Range Rule 10 was adopted as a safety measure based on a recommendation from Defendants' insurance agent.  (Nicole Decl. ¶ 7).

54.     Gun Range Rule 10 permits Defendants to pause (*i.e.*, take a safety "time out") when they have a safety concern, which then allows them time to conduct an investigation and background check of an individual who caused the safety concern.  (Nicole Decl. ¶¶ 6-7; *see also* Fatihah Dep. at 65:17-25 to 67:1-6, Ex. 15 [Gun Range Rules]).

55.     Defendants invoked Gun Range Rule 10 the morning that Plaintiff came to use the gun range based on Plaintiff's actions that morning and all of the surrounding circumstances and not based on Plaintiff's religion.  (Nicole Decl. ¶¶ 6-9, 27-40, 45).

56.     Plaintiff does not object to Gun Range Rule 10.  (Fatihah Dep. at 66:21-23 to 67:3-6).

57.     Following Plaintiff's visit to the Gun Range on October 23, 2015, and before Plaintiff filed this lawsuit in February 2016, Defendants invoked Gun Range Rule 10 when a customer who wanted to shoot at the range simply appeared distracted and in a rush.  (Nicole Decl. ¶¶ 10, 12).

58.     In July 2015, and in response to the Chattanooga, Tennessee terrorist attack committed by an Islamic jihadist who had reportedly trained at a gun range prior to his deadly shooting spree, Defendant Nicole Neal directed Defendant Chad Neal to post an 8.5" x 11" homemade sign, stating: "This privately owned business is a Muslim free establishment.  We reserve the right to refuse service to anyone."  (Nicole Decl. ¶¶ 13-16, Ex. H [Political Sign]).

59.     Defendant Nicole Neal's testimony regarding the sign was unequivocal:

Q: What does the sign mean in terms of who may use your business?
A: It does not.
Q: I'm not understanding the answer.  What does the sign mean in terms of who may use your business?
A: It does not.
Q: It does not mean anything?
A: It does not mean who can use my business.
Q: Okay.  So this sign—does this sign mean that no Muslims are allowed in the business?
A: No, it does not.
Q: What was the purpose of posting it?
A: This sign is a political protest to the Chattanooga attacks.
Q: What do you think customers—what did you anticipate customers would think when they saw that sign?
A: I do not know what customers would think.
                                        * * *
Q: ***So did you intend the sign to convey a business policy to the public?***
A: ***No***.

- 11 -

(Nicole Dep. at 72:3-25 to 74:1-4) (emphasis added).

      60.     No one has ever been denied service at Defendants' gun range based solely on his or her religion or any other characteristic prohibited by law.  (Nicole Decl. ¶¶ 19-21; Fatihah Dep. 68:10-25 to 69:1-7, 70:21, Exs. 13, 14, 15 [admitting Defendants did not inquire into Plaintiff's religion]).

      61.     Plaintiff, a professed avid shooter, testified that Defendants' range safety policy prohibiting someone from shooting at the range who is associated with an organization which the federal government has determined has ties to terrorism is the "responsible" thing to do:

> Q: Do you have any objection to a gun range adopting a safety-conscious policy like that as indicated in Exhibit No. 18 that you just read?
> MR. HENDERSON: Objection.
> A: Being a Muslim and understanding the current climate with regard to Islam, I think it's problematic that the language on association with terrorism and I would question how they make the determination as to who is associated with terrorism and—
> Q: Let me pause you.  What if they relied on the government, the U.S. government, would that be appropriate?
> MR. HENDERSON: Objection.
> A: If the United States government determined an organization was a terrorist organization, I think it would be responsible of them to follow that guidance.
> Q: And how about if the government determined that ***they have ties to terrorist organizations***?
> MR. HENDERSON: Objection.
> A: If the government determined that an organization has ties to a terrorist organization, I think it would also be ***a responsible thing***.
> Q: ***To not allow them to shoot at the range***?
> A: ***Yes***.

(Fatihah Dep. at 120:4-25 to 121:1-2; Dep. Ex. 18; *see also* 65:18-25 to 67:1-6; 117:11-16; 118:7-25 to 119:1-3 [acknowledging the danger of operating a gun range and admitting that safety is paramount]).

## ARGUMENT

## I.    Defendants' Gun Range Is Not a "Place of Public Accommodation."

      Plaintiff alleges that Defendants violated Title II, which prohibits discrimination based on protected categories, including religion, in the provision of "full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation."  42 U.S.C. § 2000a.  However, not every business that is open to the public is a

"place of public accommodation" subject to Title II.  That term is narrowly and comprehensively defined by the statute to include:

> (1) any inn, hotel, motel, or other establishment which provides lodging to transient guests . . . ;
> (2) any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption on the premises, including, but not limited to, any such facility located on the premises of any retail establishment; or any gasoline station;
> (3) any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment; and
> (4) any establishment (A)(i) which is physically located within the premises of any establishment otherwise covered by this subsection, or (ii) within the premises of which is physically located any such covered establishment, and (B) which holds itself out as serving patrons of such covered establishment.

42 U.S.C. § 2000a(b).  Absent from this list is a gun range—particularly one that is foremost an adjunct of a retail establishment.  In fact, it was not the intent of Congress, as demonstrated by the plain language of the statute, to cover retail establishments.  As noted above, the definition section of the statute includes a detailed list of establishments, none of which is a retail store and certainly not a retail store with a gun range.   Moreover, the definition section includes cafeterias, lunchrooms, and any "facility principally engaged in selling food for consumption on the premises . . . of any retail establishment," s*ee id*., further demonstrating that Congress did not intend to include retail establishments, including those with gun ranges on their premises, within the statute's prohibitions.  If Congress intended the statute to apply to *all* retail establishments, there would be no need to state that restaurants within retail establishments are covered.  And if gun ranges were a place that Congress wanted to include in the statute, it could have done so expressly.

Thus, in enacting the public accommodations section of the 1964 Act, Congress did not intend to regulate all establishments that it had power to regulate.   Broad coverage of retail establishments was originally contemplated, *see* H.R. 7152, but that coverage was deleted when the House Judiciary Committee reported the bill.  H.R. No. 914 on H.R. 7152, 88th Congress, 1st Sess., Part I. at 2-3.  Congress intended to limit coverage to "those business establishments which *on the basis of current experience* have proved to be the most important sources of discrimination and, therefore, the focal point of most discriminations."  House Judiciary Comm. Hearings on H.R. 7152, Part IV, a 2655-56 (statement of Attorney General Kennedy) (emphasis added).  Consequently, an establishment which may meet the commerce connection requirement of §

- 13 -

2000a(c)(3) might nevertheless fail to qualify as a "place of entertainment" under § 2000a(b)(3), which is precisely the situation here.

In *Newman v. Piggie Park Enterprises, Inc.*, 377 F.2d 433 (4th Cir. 1967), the court reviewed the history of discrimination and why Congress covered restaurants but not retail stores, stating: "The sense of this plan of coverage is apparent.  Retail stores, food markets, and the like were excluded from the Act for the policy reason that there was little, if any, discrimination in the operation of them."  *Id*. at 436; *Priddy v. Shopko Corp.*, 918 F. Supp. 358 (D. Utah 1995) (holding that a retail establishment was not a place of public accommodation).  Similarly here, there is no history of discrimination at retail stores that include gun ranges.  ***None***.  *See generally Miller v. Amusement Enters., Inc.*, 391 F.2d 86 (5th Cir. 1967), *rev'd*, 394 F.2d 342 (1968) (*en banc*) (including as an appendix a brief from the Civil Rights Division of the Department of Justice setting forth the legislative history of the Act).

This construction of the statute was also confirmed by the Fourth Circuit in *Denny v. Elizabeth Arden Salons, Inc.*, 456 F.3d 427 (4th Cir. 2006), where the court reasoned that because § 2000a(b) "sets forth a comprehensive list of establishments that qualify as a 'place of public accommodation,'" it "excludes from its coverage those categories of establishments not listed." *Id.* at 431.

In *Denny*, the Fourth Circuit rejected the plaintiffs' argument that a beauty salon was a covered place of entertainment under § 2000a(b)(3).  Relying on the "plain text of the statute," the court explained that beauty salons "are not mentioned in any of the numerous definitions of 'place of public accommodation.'"  *Id.* (quoting § 2000a(b)(3)).  "They also bear little relation to those places of entertainment that are specifically listed, which strongly suggests that a salon would not fall within the catchall language 'other place of exhibition or entertainment.'"[7]  *Id.* (quoting § 2000a(b)(3)).  The court explained further,

> Title II approached the question of what is an establishment not through a generic definition, but through a series of extended lists.  Indeed, § 2000a(b) lists no fewer than fourteen examples of establishments, and subsection (b)(3) lists no fewer than five different places of entertainment.  Barber shops and beauty salons are sufficiently common and pervasive that we cannot casually attribute their omission to mere oversight.  Indeed, it would have been easy enough for Congress to have included them.

---

[7] Oklahoma specifically exempts from its anti-discrimination statute any "barber shops or beauty shops or privately-owned resort or amusement establishments."  Okla. Stat. tit. 25, § 1401.

*Id.* at 433-34.

The same reasoning holds true for Defendants' gun range. Gun ranges, let alone businesses that are principally retail stores that include a small gun range as an adjunct, are not included in any of the categories of establishments listed in § 2000a(b)(3). And an adjunct gun range bears little relation or resemblance to the places specifically mentioned, namely, a motion picture house, theater, concert hall, sports arena, or stadium such that Defendants' gun range would not fall within the catchall category of "other place of exhibition or entertainment."

> As the Fourth Circuit observed:
>
> If . . . Congress had intended for "place of entertainment" to encompass any service establishment with tangential entertainment value, there would have been no reason for Congress to include separate subsections for hotels, restaurants, and similar establishments in the statute. Thus to include in the statute all places where patrons might go in some part for relaxation [or enjoyment] renders unnecessary the entire exercise in statutory draftsmanship that Congress undertook in 42 U.S.C. § 2000a(b).[8] We therefore decline to allow plaintiffs to bootstrap defendant's establishment into the "place of entertainment" provision, and thereby circumvent the congressional balance evidenced in § 2000a(b).

*Denny*, 456 F.3d at 431-32. Similarly here, this Court should reject Plaintiff's effort to "bootstrap" Defendants' business into the "place of exhibition or entertainment" provision of Title II. Indeed, Defendants' business is not analogous to the establishments that other courts have held to be places of entertainment—establishments where amusement and recreation were central to their purpose. *See, e.g., Daniel v. Paul*, 395 U.S. 298 (1969) (concluding that a recreational area, which had a snack bar and facilities for swimming, boating, sunbathing, picnicking, miniature golf, and dancing was a "place of public accommodation"); *United States v. Greer*, 939 F.2d 1076, 1091 n. 15 (5th Cir. 1991) (public parks); *United States v. Lansdowne Swim Club*, 894 F.2d 83, 87 (3d Cir. 1990) (community swimming facility); *Smith v. YMCA of Montgomery, Inc.*, 462 F.2d 634, 636, 648 (5th Cir. 1972) (offering "numerous recreational activities, such as swimming, scuba diving, table tennis, basketball, [and] tennis" and maintaining several recreational facilities, including "five

---

[8] This is why it is entirely consistent to hold, as a matter of law, that Defendants' business does not fall within the framework of the *federal* statute and why it does fall within the specific *exception* of the Oklahoma statute. In short, the Oklahoma legislature, unlike Congress, did not include separate subsections for hotels, restaurants, and similar establishments. Rather, Oklahoma intended to broadly exclude <u>all</u> "places of entertainment." Congress, on the other hand, included "places of entertainment," but those "places" are more narrowly construed to exclude places like Defendants' retail establishment and adjunct gun range.

gymnasiums, a health club, and eight swimming pools"); *Evans v. Seaman*, 452 F.2d 749, 751 (5th Cir. 1971) (roller skating rink); *United States v. Cent. Carolina Bank & Trust Co.*, 431 F.2d 972, 973-74 (4th Cir. 1970) (golf course); *Scott v. Young*, 421 F.2d 143, 144-45 (4th Cir. 1970) (recreational area that was "a virtual carbon copy" of the business in *Paul*); *Miller v. Amusement Enters., Inc.*, 394 F.2d 342, 351 (5th Cir. 1968) (*en banc*) (amusement park).

While belonging to and participating in a sporting club and all that such a membership would entail *might* qualify as "entertainment" under the federal statute,[9] simply shooting at a range that is part of a retail establishment is not.  Consequently, Defendants' business is not covered.

And as noted, Plaintiff cannot bring a cause of action under state law against Defendants' business because Oklahoma broadly excludes from its coverage *any* "amusement establishments." Okla. Stat. tit. 25, § 1401.  While Oklahoma law includes retail establishments, Plaintiff was not denied any services related to Defendants' retail business—Plaintiff was denied use of the gun range (*because of his actions and his ties to CAIR* and <u>not</u> because of his religion).

## II. Defendants' Protected Speech Cannot Serve as a Basis for Civil Liability.

Declaring one's business "Muslim Free" or posting a sign to that effect is insufficient to make out a civil claim as a matter of First Amendment jurisprudence.  Such a declaration, particularly when it is made contemporaneously with and in protest to a public event such as the Chattanooga, Tennessee terrorist attack, as in this case, is public issue speech which "occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982); *Carey v. Brown*, 447 U.S. 455, 467 (1980)).  Consequently, Defendants cannot be held liable for the civil claim advanced here.  Speech, no matter how controversial or odious it might be to the listener, cannot serve as the basis for civil liability.  This was confirmed by the U.S. Supreme Court in *Snyder v. Phelps*, 562 U.S. 443 (2011).  In *Snyder*, the Court held that the First Amendment shielded the defendants from tort liability for engaging in offensive

---

[9] *See Durham v. Red Lake Fishing & Hunting Club, Inc.*, 666 F. Supp. 954, 959 (W.D. Tex. 1987) (stating that "the Club's *primary purpose* is for hunting, fishing and boating," and opining "that these recreational activities at the Club place the Club under the definition of 'place of entertainment' as applied to Title II") (emphasis added); *cf. Concord Rod & Gun Club, Inc. v. Mass. Com. Against Discrimination*, 402 Mass. 716; 524 N.E.2d 1364 (1988) (concluding that the Concord Rod and Gun Club, Inc., whose activities are carried out in a clubhouse and on surrounding grounds, was a "place of public accommodation, resort or amusement" under Massachusetts' anti-discrimination law).

speech. In its opinion, the Court observed that "[s]peech is powerful," noting that "[i]t can stir people to action, move them to tears of both joy and sorrow, and—as it did here—inflict great pain." *Id*. at 460-61. However, as the Court noted, "we cannot react to that pain by punishing the speaker. As a Nation we have chosen a different course—to protect even hurtful speech on public issues to ensure that we do not stifle public debate. That choice requires that we shield Westboro from tort liability for its picketing in this case." *Id*.; *see also Claiborne Hardware, Co*., 458 U.S. at 929 (holding that the speaker could not be held civilly liable for his speech).

Here, Plaintiff objects to Defendants' sign, and the evidence he presents in an effort to hold Defendants civilly liable is simply more speech (media interviews, social media, *etc*.). There is no evidence to show that Defendants have a standard operating procedure of prohibiting Muslims from using the gun range simply because they are Muslim. Aside from this one, isolated incident (*i.e.*, the lawsuit that Plaintiff *set up here*), which presented a safety issue, there is *no other* involving a Muslim. Defendants *never* inquire into a person's religion (and didn't do so with Plaintiff in this case), because it is not relevant. Plaintiff was denied use of the range on October 23, 2015, because he posed a safety threat and concern for Defendants, and Plaintiff is further denied use of the gun range because he is affiliated with CAIR—a *non-religious* organization with ties to terrorism[10]—and because of his reckless disregard for safety, as demonstrated by his actions on October 23, 2015, and thus willingness to go to a gun range with a concealed recording device in order to create a conflict with the range owners.

## III. Plaintiff Cannot Establish a Standard Operating Procedure of Discrimination.

To succeed on the merits, Plaintiff must "prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts. [He must] establish by a preponderance of the evidence that [religious] discrimination was [Defendants'] standard operating procedure—the regular rather than the unusual practice." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977). To that end, the allocation of burdens and the order for presenting proof of Defendants' alleged discriminatory operating procedure is as follows:

First, the plaintiff has the burden of proving by the preponderance of the evidence a *prima facie* case of discrimination. Second, if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant "to articulate some

---

[10] CAIR is not a religious organization, nor does someone have to be a Muslim to work for, or be associated with, CAIR. (Soltani Dep. at 13:20-22). Consequently, denying someone use of the range because they are associated with CAIR raises *no issues* under federal or state law.

legitimate, nondiscriminatory reason for [Plaintiff's] rejection." . . . Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)).

To begin, Plaintiff cannot establish a *prima facie* case of discrimination. Defendants do not have a standard operating procedure of denying use of their gun range solely on the basis of religion nor was Plaintiff denied use of the gun range solely on the basis of his religion. As Plaintiff admits, Defendants even considered allowing him to shoot at their range on the day he arrived despite the disturbance he was creating, but then prudently decided otherwise as the tension mounted. If there was a ban on Muslims *for being Muslim*, upon disclosing his name (Raja'ee Fatihah), Plaintiff would have been denied service—but he wasn't. It wasn't until he exposed his agenda, assumed a threatening stance, and engaged in a verbal dispute with Defendants (any one of which would be a legitimate basis for denying service that day), that Defendants exercised their written policy provision that permits them to take a "time out" when a potential safety issue arises. Indeed, when someone appears distracted, in a rush, or impatient, Defendants have invoked this policy provision. (Nicole Decl. ¶¶ 10, 12). This is a gun range. It is dangerous. And upon conducting their background check and finding that Plaintiff is a board member of CAIR—an organization that federal, local, and foreign governments have identified as an organization with ties to terrorism (and one that already threatened legal action against Defendants on account of their sign)—Defendants appropriately (and legally) denied Plaintiff's membership. And even if Plaintiff could make out a *prima facie* case of discrimination, Defendants have certainly articulated legitimate, nondiscriminatory reasons for rejecting Plaintiff's request to fire his weapons at their range, and there is nothing pretextual about these reasons, which are amply supported by the record.

**IV.   Plaintiff Lacks Standing to Pursue His Claims.**

In an effort to give meaning to Article III's "case" or "controversy" requirement, the courts have developed several justiciability doctrines, including standing. *See Susan B. Anthony List v. Driehaus,* 134 S. Ct. 2334, 2341 (2014). "The doctrine of standing gives meaning to these constitutional limits by identifying those disputes which are appropriately resolved through the judicial process." *Id.* (internal quotations and citation omitted).

Consequently, to invoke the jurisdiction of a federal court, "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984).  Plaintiff cannot establish standing in this case.

"In a suit under Title II, a plaintiff may not recover damages, but is entitled only to injunctive relief." *Brooks v. Collis Foods, Inc.*, 365 F. Supp. 2d 1342, 1351 (N.D. Ga. 2005) (citing *Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 401-02 (1968)); *see also Bray v. RHT, Inc.*, 748 F. Supp. 3, 5 (D.D.C. 1990) ("[T]he Supreme Court has been clear in that the substantive rights to public accommodations defined in § 2000a and § 2000a-1 are to be enforced exclusively by injunction." (citing *Adickes v. Kress & Co.*, 398 U.S. 144, 150-51 n. 5 (1970); *United States v. Johnson*, 390 U.S. 563, 567 (1968)).  "In order to claim injunctive relief, a plaintiff must show 'real or immediate threat that the plaintiff will be *wronged* again—a likelihood of substantial and immediate irreparable injury.'" *Brooks*, 365 F. Supp. 2d at 1351 (quoting, *inter alia*, *City of L.A. v. Lyons*, 461 U.S. 95, 111 (1983)) (emphasis added).

Plaintiff, a board member of CAIR-Oklahoma, is disqualified from using the gun range based on Defendants' lawful policy of prohibiting individuals from using the range who are associated with organizations which have ties to terrorism—a policy that Plaintiff admits is "responsible."  CAIR-Oklahoma is such an organization.  Moreover, CAIR-Oklahoma is not a religious organization.  Anyone working for CAIR or any of its affiliates, whether or not the person is Muslim, Christian, agnostic, or an atheist, is prohibited from firing at Defendants' gun range. Neither Title II nor Oklahoma law prohibits denying a person service at a business based on the person's affiliation with a non-religious group that has ties to terrorism.  And the existence of these ties is acknowledged by the United States government and state governments (Louisiana in particular), not to mention at least one foreign government (UAE).

Additionally, Plaintiff has demonstrated his reckless disregard for safety by going to a gun range armed with a loaded handgun, a military-style rifle, and a recording to device to create a controversy with the owners so as to file a lawsuit.  There is now a serious conflict between Plaintiff and Defendants such that Plaintiff's ban from using the range is entirely appropriate and independent from any claim of religious discrimination.  The business at issue is not a lunch counter.  It is a firing range.  It is dangerous to allow (or to order) a situation where tension exists between and amongst the operators of the range and those who seek to use it.  This is yet another

- 19 -

reason why a firing range is not properly a place of public accommodation, particularly in light of the fact that the exclusive remedy is injunctive relief.

Finally, Plaintiff has only ever been to this gun range (and Oktaha) once in his life (Fatihah Dep. at 121:19-21)—to set up this lawsuit. There are other gun ranges he uses (quite frequently) that are closer and more convenient for him. There is no basis to conclude that he will ever go to Defendants' gun range again.

In sum, Plaintiff cannot show that he will be "wronged" in the future such that he has no claim for relief and thus lacks standing. This lawsuit should be dismissed.[11]

## V. Plaintiff Failed to State a Claim under State Law and this Court Has No Jurisdiction to Hear this Claim because Plaintiff Failed to Exhaust His Statutory Remedies.

In *Oklahoma Human Rights Commission v. Hotie*, 505 P.2d 1320, 1321 (Okla. 1973), a complaint was filed with the Oklahoma Human Rights commission alleging that the Onyx Club of Oklahoma City had engaged in a discriminatory practice by denying the complainant equal access to the club because of the complainant's color. Per the court, "The complaint was made and the subsequent proceedings through the district court were conducted pursuant to what is now 25 O.S. 1971 § 1101 through § 1802." *Id.* The complaint was brought pursuant to Title 25, Section 1402 of the Oklahoma Statutes—the very same statute at issue here. *See Hotie, Inc.*, 505 P.2d at 1321 ("The civil rights proceeding before the Commission, under Section 1501 through 1505, involved an alleged 'discriminatory practice' mentioned in Section 1402. . . ."). Thus, a claim arising under § 1402 falls within the statutory scheme set forth by Oklahoma law to address alleged discriminatory practices, including § 1502.

Consequently, pursuant to the Oklahoma statutory scheme at issue here, a person who complains of a "discriminatory practice" under §1402 is required to exhaust his statutory remedies before pursuing any action in a court of law. *See* Okla. Stat. tit. 25, § 1502 (requiring the filing of a complaint with the Attorney General's Office of Civil Rights Enforcement "within one hundred

---

[11] Upon dismissing the federal cause of action, this Court should dismiss the remaining state law claim. While the Court has discretion to retain this claim, *see* 28 U.S.C. § 1367(c)(3), there is no compelling reason to do so, *see Thatcher Enters. v. Cache Cnty. Corp.*, 902 F.2d 1472, 1478 (10th Cir. 1990) ("If the federal claim is dismissed before trial, even though not insubstantial in the jurisdictional sense, the state law claim will generally be dismissed as well. Notions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary.").

eighty (180) days after the alleged discriminatory practice occurs"). This point was made clear by the Oklahoma Supreme Court in *Atkinson v. Halliburton Co.*, 905 P.2d 772 (Okla. 1995).

In *Atkinson*, the Court noted that "[i]t is a long established doctrine in Oklahoma that exhaustion of statutory remedies is a *jurisdictional prerequisite* for resort to the courts. . . . The doctrine of exhaustion of administrative remedies is a well settled rule that aids in the administration of justice and prevents transfers to the courts of duties imposed by law on administrative agencies." *Id.* at 774 (internal citations omitted) (emphasis added). Moreover, in *Atkinson*, the Court expressly rejected the plaintiff's argument that the "entire statutory scheme is optional" because the legislature used the word "may" in § 1502. In doing so, the Court concluded that "the use of the word 'may' confers upon an aggrieved party the **right** to seek redress for his grievances without imposing on that party a **legal duty** to do so. In short, not everyone who believes themselves to have been a target of . . . discrimination must seek to remedy it, to that extent the Act is permissive. Those who do wish to seek redress are empowered to do so through the statutory scheme." *Id.* at 775-776. In closing, the Court stated, "When a party's right of access to the courts is protected by following the statutory scheme, exhaustion of the procedures of that scheme is a condition precedent to filing an action with the courts."[12] *Id.* at 777.

Here, because Plaintiff failed to follow the procedures set forth in the Oklahoma statutory scheme—a jurisdictional prerequisite—he cannot pursue his cause of action in this Court. In his First Amended Complaint, Plaintiff failed to allege any facts (or subsequently present evidence, including evidence that he was issued a "Dismissal and Notice of Right to Sue") demonstrating that he has complied with this jurisdictional prerequisite. Consequently, this Court has no jurisdiction to hear Plaintiff's state law claim. The claim must be dismissed.

## CONCLUSION

For the forgoing reasons, Defendants request that this Court grant their motion and enter judgment in their favor on all claims.

---

[12] And this is also true for situations where, as here, the plaintiff is claiming that the same action also arises under common law. *Atkinson*, 905 P.2d at 773 (holding that it is also a prerequisite to filing a tort claim alleging discrimination in violation of Oklahoma's public policy to exhaust the procedural requirements set forth in the statute).

Respectfully submitted,

AMERICAN FREEDOM LAW CENTER

/s/ *Robert J. Muise*
Robert J. Muise, Esq.* (MI Bar No. P62849)
PO Box 131098
Ann Arbor, Michigan 48113
Tel: (734) 635-3756
Fax: (801) 760-3901
rmuise@americanfreedomlawcenter.org

David Yerushalmi, Esq.* (Ariz. Bar No. 009616;
DC Bar No. 978179; Cal. Bar No. 132011; NY Bar No. 4632568)
1901 Pennsylvania Avenue NW
Suite 201
Washington, D.C. 20006
dyerushalmi@americanfreedomlawcenter.org
Tel: (646) 262-0500
Fax: (801) 760-3901

*Admitted *pro hac vice*

WOOD, PUHL & WOOD, P.L.L.C.

/s/ *Scott B. Wood*
Scott B. Wood, Esq. (OBA 12536)
2409 E. Skelly Dr., Suite 200
Tulsa, Oklahoma 74105
Tel: (918) 742-0808
Fax: (918) 742-0812

*Attorneys for Defendants Chad Neal and Nicole Mayhorn Neal*

- 22 -

**CERTIFICATE OF SERVICE**

I hereby certify that on April 28, 2017, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the court's electronic filing system.  Parties may access this filing through the court's system.  I further certify that a copy of the foregoing has been served by ordinary U.S. mail upon all parties for whom counsel has not yet entered an appearance electronically: None.

AMERICAN FREEDOM LAW CENTER

/s/*Robert J. Muise*
Robert J. Muise, Esq.