UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

RAJA'EE FATIHAH,

          Plaintiff,

    v.

CHAD NEAL (d.b.a. Save Yourself Survival
and Tactical Gun Range) and NICOLE
MAYHORN NEAL (d.b.a. Save Yourself
Survival and Tactical Gun Range),

          Defendants.

No. 6:16-cv-00058-JHP

---

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT

---

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION .......................................................................................................... 1

RESPONSE TO DEFENDANTS' STATEMENT OF FACTS ...................................... 1

ARGUMENT ................................................................................................................ 13

I.      MR. FATIHAH HAS STANDING. ................................................................ 13

II.     THE GUN RANGE IS A "PLACE OF ENTERTAINMENT" UNDER TITLE II. ......... 15

III.    IT IS PLAINTIFF, NOT DEFENDANTS, WHO IS ENTITLED TO SUMMARY
        JUDGMENT. ................................................................................................... 20

        A.      Defendants Apply the Wrong Legal Standard to the Discrimination
                Analysis. .............................................................................................. 20

        B.      Defendants Have Not Adduced Evidence Sufficient to Meet Their Burden
                Under the Direct Evidence Standard. .................................................. 22

        C.      The First Amendment Does Not Shield Defendants From Liability. ..... 28

CONCLUSION ............................................................................................................. 29

# TABLE OF AUTHORITIES

**CASES**

*Aurora Loan Services, Inc. v. Craddieth*, 442 F.3d 1018 (7th Cir. 2006) ......................................14

*Brown v. Perez*, 835 F.3d 1223 (10th Cir. 2016), *amended on reh'g* (Nov. 8, 2016) .................................................................................................................................................3

*CAIR Florida, Inc. v. Teotwawki Investments, LLC*, No. 15-CV-61541, 2015 WL 11198249 (S.D. Fla. Nov. 24, 2015).....................................................................................20

*Colorado Cross-Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205 (10th Cir. 2014).................................................................................................................15

*Concord Rod & Gun Club, Inc. v. Massachusetts Commission Against Discrimination*, 402 Mass. 716 (1988) .............................................................................16

*Daniel v. Paul*, 395 U.S. 298 (1968)..........................................................................16, 17, 19

*Denny v. Elizabeth Arden Salons, Inc.*, 456 F.3d 427 (4th Cir. 2006)............................................19

*Dewitt v. Southwestern Bell Telephone Co.*, 845 F.3d 1299 (10th Cir. 2017)..............................28

*Doe v. Division of Youth & Family Services*, 148 F. Supp. 2d 462 (D.N.J. 2001)........................16

*Durham v. Red Lake Fishing & Hunting Club, Inc.*, 666 F. Supp. 954 (W.D. Tex. 1987) .........................................................................................................................15, 16

*Dysart v. Palms of Pasadena Hospital*, 89 F. Supp. 3d 1311 (M.D. Fla. 2015).....................22, 24

*E.E.O.C. v. Alton Packaging Corp.*, 901 F.2d 920 (11th Cir. 1990) ............................................20

*Fahim v. Marriott Hotel Services, Inc.*, 551 F.3d 344 (5th Cir. 2008) ...................................21, 25

*Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949)........................................................29

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ................................................................14

*Hilde v. City of Eveleth*, 777 F.3d 998 (8th Cir. 2015) ..................................................................25

*Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323 (11th Cir. 2013) ......................................14

*In re Special Grand Jury 89-2*, 450 F.3d 1159 (10th Cir. 2006) ....................................................14

*Initiative & Referendum Institute v. Walker*, 450 F.3d 1082 (10th Cir. 2006) .............................14

*International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977) ...................20, 28

*Jackson v. Motel 6 Multipurpose, Inc.*, 931 F. Supp. 825 (M.D. Fla. 1996) ................................14

*Jackson v. Waffle House, Inc.*, 413 F. Supp. 2d 1338 (N.D. Ga. 2006)...........................................15

*Johnson v. Weld County*, 594 F.3d 1202 (10th Cir. 2010).................................................................3

*Lance v. Plummer*, 353 F.2d 585 (5th Cir. 1965) ..........................................................................17

*LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412 (2d Cir. 1995)...........................................................25

*Long v. Laramie County Community College District*, 840 F.2d 743 (10th Cir. 1988) ....................................................................................................................................20

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) .............................................................20

*McWright v. Alexander*, 982 F.2d 222 (7th Cir. 1992)...................................................................24

*Miller v. Amusement Enters., Inc.*, 394 F.2d 342 (5th Cir. 1968) (en banc) ...........................16

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) ...........................................................28

*Perry v. Kunz*, 878 F.2d 1056 (8th Cir. 1989) ...............................................................................21

*Rousseve v. Shape Spa for Health & Beauty, Inc.*, 516 F.2d 64 (5th Cir. 1975) ..........................18

*Rumsfeld v. Forum for Academy and Institutional Rights, Inc.*, 547 U.S. 47 (2006) ...................28

*Sayed-Aly v. Tommy Gun, Inc.*, 170 F. Supp. 3d 771 (E.D. Pa. 2016) .........................................16

*Scott v. Harris*, 550 U.S. 372 (2007) .............................................................................................28

*Slocumb v. Waffle House, Inc.*, 365 F. Supp. 2d 1332 (N.D. Ga. 2005).......................................15

*Smith v. Young Men's Christian Ass'n of Montgomery, Inc.*, 462 F.2d 634 (5th Cir. 1972) ....................................................................................................................................17

*Snyder v. Phelps*, 562 U.S. 443 (2011) ..........................................................................................29

*Tabor v. Hilti, Inc.*, 703 F.3d 1206 (10th Cir. 2013) .....................................................................25

*Tandy v. City of Wichita*, 380 F.3d 1277 (10th Cir. 2004) .................................................13, 14, 15

*United States v. Baird*, 85 F.3d 450 (9th Cir. 1996) ..........................................................16, 17, 18

*United States v. Central Carolina Bank & Trust Co.*, 431 F.2d 972 (4th Cir. 1970) ...................17

*United States v. DeRosier*, 473 F.2d 749 (5th Cir. 1973) ..................................................16, 17, 18

*United States v. Holy Land Foundation for Relief & Development*, No. 3:04-cr-00240-P (N.D. Tex. July 1, 2009) .................................................................................4

*United States v. Lansdowne Swim Club*, 894 F.2d 83 (3d Cir. 1990) ............................15

*United States v. One-Sixth Share of James J. Bulger*, 326 F.3d 36 (1st Cir. 2003) ........14

*United States v. Wilson*, 154 F.3d 658 (7th Cir. 1998) ..................................................29

**STATUTES**

42 U.S.C. § 2000a(b)(3) .........................................................................................15, 19

42 U.S.C. § 2000a(c)(3) ...............................................................................................15

42 U.S.C. § 2000a(e) .....................................................................................................15

42 U.S.C. § 2000a-2 .......................................................................................................17

42 U.S.C. § 2000a-3 .......................................................................................................17

Okla. Stat. tit. 25 § 1401 ...............................................................................................19

**OTHER AUTHORITIES**

Center for Security Policy, Southern Poverty Law Center, https://www.splcenter.org/fighting-hate/extremist-files/group/center-security-policy (last visited May 12, 2017) ....................................................................................23

Fed. R. Civ. P. 56(c) .......................................................................................................3

Cheryl Hall, *Who Knew? Laser Tag Was Invented in Dallas*, Dallas Morning News (May 14, 2014), https://www.dallasnews.com/business/business/2014/05/06/who-knew-laser-tag-was-invented-in-dallas ..................................................................................19

Local Civil Rule 56.1(c) ..................................................................................................1

Dashka Slater, Who Made That Paintball? N.Y. Times (Aug. 15, 2014), https://www.nytimes.com/2014/08/17/magazine/who-made-that-paintball.html .......................................................................................................19

*Target Shooting in America*, National Shooting Sports Foundation, 2 (2013), http://www.nssf.org/PDF/research/TargetShootingIn AmericaReport.pdf ...........................16

## INTRODUCTION

Defendants Nicole and Chad Neal posted a sign at the entry of their business, a shooting range, proclaiming it "*A MUSLIM FREE ESTABLISHMENT*" and declaring that they reserve the right to refuse service to anyone. They posted a similar message on the business's public Facebook page and then undertook a round of media interviews in which they repeatedly announced they would not allow Muslims (or "muzrats," as Mr. Neal slurs them) to use their Gun Range. Basking in the attention sparked by their discriminatory sign, Defendants even urged the business's Facebook followers to "Google us…it's going viral folks!" As Mrs. Neal explained, the sign was intended to give "forewarning" to Muslims "so they don't have to come in here and I have to tell them to go away." And, when Raja'ee Fatihah, an Army Reservist who is Muslim, revealed his Muslim faith while attempting to patronize the Gun Range, Defendants responded just as they said they would: They told him to go away and denied him service.

Defendants' discriminatory conduct blatantly violates Title II of the Civil Rights Act of 1964. Recognizing the humiliation and indignity that occur when individuals are denied access to public accommodations because of protected characteristics, such as religion, Title II prohibits discrimination by businesses like the one operated by Defendants. As explained below, the Court should grant summary judgment in favor of Plaintiff and deny Defendants' motion.

## RESPONSE TO DEFENDANTS' STATEMENT OF FACTS[1]

1. Undisputed, but incomplete. Plaintiff is a Muslim who follows the dictates of Sharia "[a]s [he] understand[s] them." Plf. Br. Ex. D, RF Dep. 7:24-25. For Mr. Fatihah, Sharia law comprises

---

[1] Per Local Civil Rule 56.1(c), Plaintiff responds to each of Defendants' Statement of Facts ("Defs. SUF") by corresponding paragraph numbers. To maintain consistency between Plaintiff's opposition brief here and Plaintiff's Memorandum in Support of Motion for Summary Judgment ("Plf. Br."), ECF No. 71, Plaintiff has, where possible, cited back to his Statement of Material Undisputed Facts located at pp. 2 to 20 of his Memorandum ("Plf. SUF") for any evidence supporting his response to Defendants' asserted facts. Where Plaintiff's response to Defendants' asserted facts relies on evidence *not* attached to Plaintiff's initial Memorandum, Plaintiff has attached that evidence to this brief as Exhibits M through P. In responding to Defendants' asserted facts, Plaintiff does not concede that any particular fact is material to this case. Individually and collectively, Defendants' alleged material facts—including the facts that Plaintiff does not dispute—do not entitle Defendants to summary judgment, nor do they preclude summary judgment in favor of Plaintiff.

religious guidelines that apply to followers of Islam. These guidelines include, among others, requirements to say his "daily prayers, worship God alone, fast the month of Ramadan, [and] treat people as [he] want[s] to be treated." *Id.* at 7:20-22. Mr. Fatihah believes that Sharia law applies only to Muslims. Plf. Br. Ex. A, NN Dep. Ex. 36 at 08:10-08:16. He firmly rejects any claim that Sharia requires him or other Muslims to commit violence, kill or lie to non-Muslims, or force anyone else to follow the Muslim faith. Plf. SUF ¶¶ 15-16. Plaintiff believes—based on the Quran, the way the Prophet Mohammad lived his life, and scholarship—that "the general spirit of Islam is that violence is generally unacceptable." Plf. Br. Ex. D, RF Dep. 114:23-115:3.[2]

2. Undisputed in part, and with clarification. Disputed that "Fatihah" is a "Muslim name" because it is unclear what Defendants mean by this, and the cited testimony does not characterize "Fatihah" as a "Muslim name."

3. Undisputed, with clarification: The legal name of the organization of which Plaintiff is a board member is "Council on American-Islamic Relations, Oklahoma, Inc." (hereinafter, "CAIR-Oklahoma"). Ex. M, Supplemental Declaration of Plaintiff Raja'ee Fatihah ("Suppl. Fatihah Decl."), ¶ 2.

4. Undisputed but incomplete. CAIR-Oklahoma is a not-for-profit corporation formed under the laws of Oklahoma and is legally independent from the Council on American-Islamic Relations ("CAIR-National"); it is governed by an independent board of directors and receives no funding from CAIR-National; and the CAIR-Oklahoma board has the final say on all policies and activities undertaken by CAIR-Oklahoma. Plf. SUF ¶ 21.

5. Undisputed, with clarification: CAIR-Oklahoma must operate within the mission of CAIR-National if it wishes to use the mission statement and logo of CAIR-National. Plf. Br. Ex. C, AS Dep. 74:18-20.

6. Undisputed, with clarification: CAIR-Oklahoma is an Islamic civil liberties and civil rights organization. In addition to advocating for civil rights for the Muslim community, CAIR-

---

[2] Defendants' Statement of Facts includes three subheadings that are not presented via numbered paragraphs. Plaintiff disputes them all. *Contrast* Defs. SUF p. 4 ("Plaintiff Belongs to an Organization with Substantial Ties to Terrorism") *with* Plf. SUF ¶ 21-23; Ex. N, Plaintiff's Rebuttal Expert Testimony of Richard M. Frankel ("Frankel Rep.") ¶¶ 47-93 (rebutting claim that CAIR and CAIR-Oklahoma are terrorist organizations). *Contrast* Defs. SUF p. 6 ("Plaintiff Came to Defendants' Range Armed with . . . an Agenda to Create a Disturbance and a Controversy") *with* Plf. SUF ¶¶ 7-8, 10-18, 33; *infra* ¶¶ 24-33. *Contrast* Defs. SUF p. 9 ("Defendants Do Not Have a Policy to Unlawfully Discriminate") *with* Plf. SUF ¶¶ 1-5,12-18, 26 & n.7, 28-32, 57-58.

Oklahoma conducts "outreach to communities and organizations to educate people about Islam." Plf. SUF ¶ 21.

7. Undisputed, but incomplete. Every current member of the board of CAIR-Oklahoma is Muslim; the overwhelming majority of individuals who take part in CAIR-Oklahoma's volunteer efforts are Muslim. Ex. M, Suppl. Fatihah Decl. ¶ 3.

8. Plaintiff objects to this asserted fact on the ground that Defendants' supporting evidence for this statement is inadmissible and thus, pursuant to Fed. R. Civ. P. 56(c), may not be considered by the Court. Specifically, the cited paragraphs in Mrs. Neal's and Mr. Yerushalmi's declarations set forth information and attachments about matters in which they had no personal involvement and are not qualified as experts. The information and documents constitute hearsay and/or are improperly authenticated. At this stage, when an evidentiary objection is made, "'[t]he burden is on the proponent [of the evidence] to show that the material is admissible as presented or to explain the admissible form that is anticipated.'" *Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016), *amended on reh'g* (Nov. 8, 2016) (quoting Fed. R. Civ. P. 56(c)(2) adv. comm. cmt.); *see Johnson v. Weld Cty*., 594 F.3d 1202, 1210 (10th Cir. 2010) (declining to consider hearsay statements in summary judgment proceedings where proponent failed to show they could be presented in admissible form at trial). Without waiving these objections, Plaintiff does not dispute this asserted fact. However, it is incomplete because it fails to provide necessary and vital context surrounding the referenced case and fails to disclose the nature of an unindicted co-conspirator listing, which provides the subject with no due process or opportunity to challenge it. *See infra* ¶ 14; Ex. N, Frankel Rep. ¶¶ 54-60.

9. Undisputed.

10. Disputed. The cited testimony does not support that Awad is a "personal friend." *See* Plf. Br. Ex. C, AS Dep. 21:6-9.

11. Plaintiff restates the evidentiary objections in paragraph 8 above with respect to Defendants' cited paragraphs in Mrs. Neal's and Mr. Yerushalmi's declarations. Without waiving these objections, Plaintiff disputes this asserted fact because the cited evidence does not fully support it.

12. Plaintiff restates the evidentiary objections in paragraph 8 above with respect to Defendants' cited paragraphs in Mrs. Neal's and Mr. Yerushalmi's declarations. Without waiving these objections, Plaintiff disputes this asserted fact because it is inaccurate. It also fails to provide

necessary and vital context surrounding the referenced case. *See* Ex. N, Frankel Rep. ¶¶ 54-70, 90-93.

13. Plaintiff objects to this asserted fact on the ground that Defendants' supporting evidence for this statement, a news article attached to Mrs. Neal's Declaration, is inadmissible hearsay. Per paragraph 8 above, the Court may not consider it at this stage. Without waiving this objection, Plaintiff disputes this asserted fact on the ground that the news article does not state that Mr. Awad threatened legal action against Defendants.

14. Plaintiff restates the evidentiary objections in paragraph 8 above with respect to Defendants' cited paragraphs in Mrs. Neal's and Mr. Yerushalmi's declarations. Without waiving these objections, Plaintiff does not dispute that a federal district court for the Northern District of Texas stated this in connection with the trial. However, CAIR was not a party to the criminal trial, and the district court also stated in the same opinion that "[n]either CAIR nor the other unindicted co-conspirators have been charged with a crime and they have no judicial forum in which to defend against the accusation." Mem. Op. Order (ECF No. 1356) at 10, *United States v. Holy Land Found. for Relief & Dev*., No. 3:04-cr-00240-P (N.D. Tex. July 1, 2009). The Court also held that the government had violated CAIR's Fifth Amendment rights. *Id.* at 11. In addition, the U.S. government has never indicted, prosecuted, or convicted CAIR of any crime. Plf. SUF ¶ 23; Ex. N, Frankel Rep. ¶¶ 48-52, 54-60; Declaration of Nicole Mayhorn Neal ("Nicole Decl."), ECF No. 68-1, ¶ 44. Moreover, in that case, CAIR-Oklahoma was never mentioned in any capacity by the court or government. *See* Ex. N, Frankel Rep. ¶ 60.

15. Plaintiff restates the evidentiary objections in paragraph 8 above with respect to Defendants' cited paragraphs in Mrs. Neal's and Mr. Yerushalmi's declarations. Without waiving these objections, Plaintiff does not dispute this asserted fact, but it is incomplete. Hamas was not designated as a foreign terrorist organization until 1997. *See* Ex. N, Frankel Rep. ¶ 68 & n.15.

16. Plaintiff restates the evidentiary objections in paragraph 8 above with respect to Defendants' cited paragraphs in Mrs. Neal's and Mr. Yerushalmi's declarations. Without waiving these objections, Plaintiff does not dispute this asserted fact. However, this asserted fact fails to acknowledge that the U.S. government has rejected this designation and has never indicted, prosecuted, or convicted CAIR or CAIR-Oklahoma for any wrongdoing. *See* Plf. SUF ¶ 23; Ex. N, Frankel Rep. ¶¶ 48-52, 54-60; Nicole Decl. ¶ 44 (admitting that Secretary of State rejected the designation and that the United States has not designated CAIR as a terrorist organization).

17. Plaintiff restates the evidentiary objections in paragraph 8 above with respect to Defendants' cited paragraphs in Mrs. Neal's and Mr. Yerushalmi's declarations. Without waiving these objections, Plaintiff disputes this asserted fact because it is inaccurate. It also fails to provide necessary and vital context surrounding the referenced case and FBI actions. *See* Ex. N, Frankel Rep. ¶¶ 54-75, 83-86, 90-93, 99 & n.39.

18. Disputed in part and incomplete. Plaintiff disputes the accuracy of Defendants' quotation of the Resolution as set forth in paragraph 18 of Defendants' SUF, and in paragraphs 43 and 17 of Mrs. Neal's and Mr. Yerushalmi's declarations, respectively. These quotations omit the word "formal" from two places in the sentence. In addition, Defendants fail to quote key, relevant language of the Resolution, which states that the Resolution "shall have no effect until the United States Department of Justice makes a determination that CAIR has been involved in or supported any terrorist activity." Defendants have produced no evidence that the Justice Department has made any such determination, and in fact, CAIR has never been indicted, prosecuted, or convicted for any criminal wrongdoing. Plf. SUF ¶ 23; Ex. N, Frankel Rep. ¶¶ 48-52, 54-60; Nicole Decl. ¶ 44. Defendants also fail to quote the resolution's warning "that nothing in this Resolution shall be construed to reflect a wholesale judgment of the CAIR organization and its entire membership or to disparage or cast negative light on the Islamic community in Louisiana or those who adhere to the Islamic faith."

19. Disputed in part. Plaintiff disputes the accuracy of Defendants' quotation of the Resolution as set forth in paragraph 19 of Defendants' SUF. This quotation omits language from the Resolution. In addition, Plaintiff disputes any implication that the "factual basis" for the Resolution is accurate. The information in the Resolution is, in fact, inaccurate, incomplete, and devoid of key relevant context. *See* Ex. N, Frankel Rep. ¶¶ 76-89.

20. Plaintiff restates the evidentiary objections in paragraph 8 above with respect to Defendants' cited paragraphs in Mrs. Neal's and Mr. Yerushalmi's declarations. Without waiving these objections, Plaintiff disputes this asserted fact for several reasons. First, Defendants' assertion that "[t]he concern about CAIR's ties to terrorism has bi-partisan support in Congress" is vague and ambiguous; it is unclear what Defendants mean by this. Second, to the extent it is possible to deduce what Defendants mean by this statement, the cited evidence does not support Defendants' characterization. Moreover, in the last two years alone, more than 60 members of

Congress from both parties sent letters to CAIR lauding the organization for its work. *See* Ex. N, Frankel Rep.¶ 102.

21. Undisputed, but Defendants' cited testimony only partially supports this assertion.

22. Undisputed, but Defendants' cited testimony only partially supports this assertion.

23. Disputed in part and incomplete. Plaintiff has visited several gun ranges within Oklahoma. Two were indoor ranges. However, Mr. Fatihah was also looking for a range with an "outdoor facility." To that end, he visited one establishment in Tulsa with an outdoor range. The range, however, did not work for him because it hosted numerous events and "extra activities," resulting in limited access to the range depending on its calendar for any particular day. He has also visited two other outdoor ranges, both a 45-minute to one-hour drive from his home. The first range, located at the Fort Gibson Wildlife Management Area in Wagoner, Oklahoma, has no formal shooting lanes or targets set up and is inadequate to satisfy Mr. Fatihah's desire to find an outdoor range that he can frequent more regularly. The other range visited by Mr. Fatihah was Defendants' Gun Range. Plf. SUF ¶ 33.

24. Disputed. Inaccurately characterizes Mr. Fatihah's testimony. *See* Plf. SUF ¶ 8.

25. Disputed. Inaccurately characterizes Mr. Fatihah's testimony. *See* Plf. Br. Ex. D, RF Dep. 76:1-22.

26. Undisputed but incomplete. Plaintiff's handgun was secured in a paddle holster. Plf. Br. Ex. D, RF Dep. 55:22-23. Plaintiff is authorized to carry a loaded handgun in Oklahoma pursuant to his concealed carry permit. *Id.* at 128:22-129:3. Plaintiff's rifle was in a scabbard case. *Id.* at 56:24-25. Plaintiff's magazines were tucked into the scabbard's side pockets. *Id.* at 57:13-15. As Plaintiff testified, "140 rounds is a small amount of ammunition to burn at a range on a good day at the range and I don't think it's uncommon, I don't think anyone running a gun range would be threatened by somebody showing up with firearms to use at a range." *Id.* at 118:2-6. Defendants did not comment on the guns Mr. Fatihah had with him, including their type, whether they were in a case, or whether they were loaded during Mr. Fatihah's visit to the business. Plf. SUF ¶ 19.

27. Undisputed but incomplete. Many gun ranges, including Defendants' Gun Range, sell eye protection and hearing protection for customers' use. Plf. SUF ¶¶ 11, 34. Mr. Fatihah indicated that he would like to purchase these items. Plf. Br. Ex. D, RF Dep. 62:1-6.

28. Disputed and incomplete. Mr. Fatihah testified that he did not hear the word "soggy" or "sloggy" on the recording. Plf. Br. Ex. D, RF Dep. 91:3-10. Further disputed to the extent that this

assertion implies that the Gun Range was unfit for use or not open. Plf. SUF ¶¶ 7, 10. Defendants admit that they invite customers to visit the Gun Range and shoot during rainy weather. Plf. SUF ¶ 10; Nicole Decl. ¶ 31.

29. Undisputed.

30. Undisputed but incomplete. Defendants do not deny that the sign was posted at that time. Plf. Br. Ex. A, NN Dep. Vol. II, 70:16-20. Mr. Fatiah testified that he was aware of Defendants' sign and "Muslim free" policy based on news reports. Plf. Br. Ex. D, RF Dep. 50:9-14.

31. Disputed in part. It is unclear what Defendants mean when they state that "Raja'ee Fatihah" is "a Muslim name." Defendants' cited evidence does not support this assertion.

32. Disputed in part and incomplete. Disputed as to the use of the vague and ambiguous phrases "out of the blue" and "declared" in this context. Plaintiff testified that he was aware of Defendants' sign through the news. Plf. Br. Ex. D, RF Dep. 50:9-14; Plf. SUF ¶ 8. Thus, his disclosure that he was a Muslim was not "out of the blue."

33. Disputed in part and incomplete. Mr. Neal testified that he did not hear Mr. Fatihah's disclosure that he is a Muslim. Plf. Br. Ex. B, CN Dep. 37:24-38:1. In addition, it is not clear what Defendants mean by the phrase "recognized what was happening."

34. Disputed. Plaintiff at no point assumed a threatening stance. Plaintiff categorically denies Mrs. Neal's assertion that, when he disclosed his Muslim faith, he dropped his right foot back or reached back with his right hand or arm toward his firearm. Nor did he make such a motion at any time during his visit to the Gun Range. Mr. Fatihah never touched his rifle or handgun during the entire time he was at Defendants' business. Ex. M, Suppl. Fatihah Decl. ¶ 4; Plf. Br. Ex. A, NN. Dep. Vol. II, 69:19-70:10. Mrs. Neal's claim that Mr. Fatihah assumed a threatening stance when disclosing his Muslim faith is contrary to Defendants' behavior thereafter: Mrs. Neal affirmed that Mr. Fatihah was "not [t]here to cause anybody any trouble," Plf. SUF ¶ 14, and Defendants continued to converse with him after that point and question him about his religious beliefs. Plf. SUF ¶ 14-17. Plaintiff left without incident and even politely told Defendants to "have a good day." Plf. SUF ¶ 18. Defendants never called the police, FBI, or any law enforcement official about Plaintiff's visit. Plf. SUF ¶ 25. Plaintiff did not try to return to the Gun Range against Defendants' wishes. When he called back to see if he would be allowed to use the Gun Range, Mrs. Neal did not even remember who he was. Plf. SUF ¶ 27.

35. Disputed.  As stated in paragraph 34 above, Plaintiff at no point assumed a threatening stance. Ex. M, Suppl. Fatihah Decl. ¶ 4.  Thus, any rustling noise on the tape was not caused by the movement Defendants describe.

36. Disputed. As stated in paragraph 34 above, Plaintiff at no point assumed a threatening stance. Ex. M, Suppl. Fatihah Decl. ¶ 4. Plaintiff wore his handgun in a paddle holster on his right hip. Plf. Br. Ex. D, RF Dep. 55:22-23. Plaintiff wore his jacket unzipped, and, although he was not looking at himself, his handgun is a "full size firearm" so he thought "that it was visible." *Id.* at 55:25-56:2.

37. Disputed. As stated in paragraph 34 above, Plaintiff at no point assumed a threatening stance. Ex. M, Suppl. Fatihah Decl. ¶ 4. Defendants' story about Mr. Fatihah's weapons has changed repeatedly. Plf. SUF ¶ 19 n.6. From the moment Mr. Fatihah entered the business to the moment he left, Defendants did not comment on the guns Mr. Fatihah had with him, including their type, whether they were in a case, or whether they were loaded. Plf. SUF ¶ 19. Defendants did not inform Mr. Fatihah that he was violating the Gun Range Rules, ask him to leave, or assert at the time that his rifle, as carried, was unsafe or improper. Plf. SUF ¶ 19. Defendants asserted previously that the rifle was loaded, Plf. Br. Ex. G, Defs.' Resp. to Pl.'s Interrog. No. 1 at 4; now, backing off that assertion, Mrs. Neal says it *appeared* the magazine was inserted. Nicole Decl. ¶ 38.

38. Disputed. Mischaracterizes the recording. After Mr. Fatihah disclosed that he is Muslim, Mrs. Neal brought up "Sharia law," railing against Muslims who "want America to change for them" and "want us to adopt Sharia law and change our ways." Mrs. Neal asked, "Do you see what I'm saying?" Mr. Fatihah then responded to her question. Plf. Br. Ex. A, NN Dep. 36 at 08:02-08:06; Plf. Br. Ex. D, RF Dep. 72:7-21. *See* Plf. SUF ¶ 14-16 (further describing interaction).

39. Undisputed but incomplete. Mr. Fatihah has made clear that he does not believe his faith requires or allows violence. Plf. SUF ¶ 14-16*;* Plf. Br. Ex. D, RF Dep. 114:23-115:3. He has testified that acts of violence where the perpetrators attribute it to their understanding of Islam are "not an expression of [his] faith and [he doesn't] believe it's an accurate reflection of what the faith teaches in general." Plf. Br. Ex. D, RF Dep. 102:17-19. When Defendants' counsel asked him about various violent acts purportedly perpetrated in the name of Islam, Mr. Fatihah pointed out that counsel had "left out the numerous mass shootings that were perpetrated by people who don't identify as Muslim." *Id.* at 114:15-17.

40. Undisputed but incomplete. Plaintiff consented to this condition. Plf. SUF ¶ 14.

41. Undisputed.

42. Undisputed.

43. Undisputed, but incomplete. Plaintiff spoke with the media after filing the lawsuit in an effort to raise awareness about rising prejudice against Muslims and widespread misinformation about the Muslim faith, as well as the humiliation and indignity that Muslims, or people of any faith, suffer when they are excluded from businesses and other places because of prejudice against their faith. Ex. M, Suppl. Fatihah Decl. ¶ 5.

44. Disputed. Defendants operate and manage the Gun Range together. Nicole Decl. ¶ 4 (Mr. Neal does "most of the maintenance work on the gun range and store, …serves as the range safety officer, and he teaches firearms courses"); Nicole Decl. Ex. L (statement referring to both Defendants as "owners"); Plf. SUF ¶ 37 (both Defendants administer the business's Facebook page); Plf. Br. Ex. B, CN Dep. 16:15-17 (part of Mr. Neal's role is "[t]o run the gun range"); *id.* at 58:10-13 & Ex. P, Additional Exhibits to the Deposition of Chad Neal ("Add'l CN Dep.") Ex. 15 (Mr. Neal's business card identifying him as the "Operator" of the business); Plf. Br. Ex. B, CN Dep. 12:19-14:19, 16:7-14 & Ex. P, Add'l CN Dep. Exs. 1, 2, 5 (Mr. Neal has ordered and purchased products for the business); Plf. Br. Ex. B, CN Dep. 58:19-25 & Ex. P, Add'l CN Dep. Ex. 17 (Mr. Neal represented the business at a gun show); Plf. Br. Ex. A, NN Dep. Vol. II, 9:21-24 (Mr. Neal has been left in charge of the business when Mrs. Neal is away); *id.* Vol. II, 145:15-17 & Ex. 49 at 00:07-13 (Mr. Neal represented himself as the "store manager" in a video interview); *id.* Vol. I, 67:11-15, 75:14-23 (Mrs. Neal consults with Mr. Neal on business decisions such as the "Muslim free" sign and Gun Range rules); *id.* Vol. I, 44:8-24 & Nicole Decl. Ex. B at 1 (both Defendants signed the incorporation documents for the business); Plf. Br. Ex. A, NN Dep. Vol. I, 39:18-40:9 & Ex. O, Additional Exhibits to the Deposition of Nicole Neal ("Add'l NN Dep.") Ex. 15 (both Defendants signed the contract for deed and both will own the land that includes the Gun Range).

45. Disputed. Plaintiff objects to this assertion to the extent that it purports to make a legal conclusion as to whether or not Defendants' business is a place of entertainment under Title II. The Gun Range and store are incorporated as one entity and operate on the same property. Plf. Br. Ex. A, NN Dep. Vol. I, 39:18-40:9 & Ex. O, Add'l NN Dep. Ex. 15. The Gun Range is an integral part of the business, as made clear by the name of the business itself. Defendants have extensively

promoted the Gun Range in various venues. Plf. SUF ¶¶ 3-5, 37-39, 50-51, 58. The Gun Range and store provide integrated services. Customers must enter the retail store to check in and purchase a daily pass or annual membership to the Gun Range, and to make their way to the range; the store sells items for use at the range, including paper targets; and the store features a family entertainment center that offers "a nice comfy place to relax when [customers] need a break from the range or are waiting on [their] friends and family to get done shooting!" Nicole Decl. ¶ 8; Plf. SUF ¶¶ 11, 34, 38; Plf. Br. Ex. G, Defs.' Resp. to Pl.'s Interrog. No. 2.

46. Disputed. It is unclear what Defendants mean by "small, 'mom and pop' operation."

47. Undisputed.

48. Disputed. Plaintiff objects to this assertion to the extent that it purports to make a legal conclusion. Defendants posted a sign at entry of their business, declaring it "*A MUSLIM FREE ESTABLISHMENT*." They repeatedly and publicly announced their intention to ban Muslims from the business, even when the business was in planning stages. Plf. SUF ¶¶ 1-5, 26, 38, 58. Once Plaintiff told Defendants that he was a Muslim, they did not let him use the Gun Range. Plf. SUF ¶¶ 12-18; Plf. Br. Ex. D, RF Dep. 74:16-18. And months after this lawsuit was filed, Mrs. Neal continued to boast publicly that she owns the "only Muslim free gun range in Oklahoma." Plf. SUF ¶ 58.

49. Disputed in part. Rule 11 was not "always in practice": Defendants' original "Gun Range Rules" did not include Rule 11. Nicole Decl. Ex. D; Plf. Br. Ex. A, NN Dep. Vol. I, 75:2-10 & Ex. 26. The Gun Range rules posted in the business when Mr. Fatihah visited in October 2015 did not include Rule 11. Nicole Decl. ¶ 8 & Ex. E; Plf. Br. Ex. A, NN Dep. Vol. II, 49:23-50:7 & Ex. 28. After Mr. Fatihah filed suit, Defendants filed incorporation documents in February 2016. Nicole Decl. Exs. A, B; Plf. Br. Ex. A, NN Dep. Vol. I, 44:10-21. Around that time, they sought the advice of counsel to develop Rule 11 and filed the amended rules with their incorporation paperwork. Plf. Br. Ex. A, NN Dep. Vol. I, 78:11-79:4. However, Defendants did not immediately post these amended rules in the store; rather the original rules continued to be posted through at least March 2016. Plf. Br. Ex. A, NN Dep. Vol. II, 49:23-50:7 & Ex. 28. Prior to the business's incorporation, including at the time of Mr. Fatihah's visit, Defendants had no codified policy limiting customers' use of the Gun Range based on their membership in or association with any group or organization. *See* Plf. SUF ¶ 31. And Defendants never exercised this policy prior to Mr. Fatihah's visit. Plf. SUF ¶¶ 13, 29-31, 45, 49. It is further disputed that Rule 11 is "in practice" today: Defendants do

10

not ask customers about the criteria in Rule 11; they do not investigate each member to see if they meet the criteria; and they do not know if all Gun Range members meet the criteria. Plf. SUF ¶¶ 53-57; Nicole Decl. ¶ 22.

50. Disputed. As to Paragraphs 43-44 and the accompanying exhibits of Mrs. Neal's declaration, which are cited in support of this assertion, Plaintiff restates the same objections from paragraph 8 above. Plaintiff further objects to this assertion to the extent that it purports to make a legal conclusion. Without waiving these objections, Plaintiff disputes this asserted fact. As stated in paragraph 49, Rule 11 was not in practice at the time of Plaintiff's visit to the Gun Range. The overwhelming evidence shows that Defendants have a policy against serving Muslims. *Supra* ¶ 48. And, once Plaintiff told Defendants that he is a Muslim, they did not let him use the Gun Range. Plf. SUF ¶¶ 12-18; Plf. Br. Ex. D, RF Dep. 74:16-18.

51. Disputed in part and incomplete. Mrs. Neal published this statement on Facebook on August 19, 2015, but it was published on her personal Facebook page. Nicole Decl. Ex. L. Defendants never published it on the business's Facebook page and did not codify it in any official documents. Even after Mrs. Neal published this statement, Defendants continued to publicly affirm their "no Muslim policy" and their animus against Muslims when it comes to operating their business. *See, e.g.*, Plf. SUF ¶¶ 1-5, 26, 58. In addition, although they continued to display their "Muslim free establishment" sign at the business, Defendants never posted any other notice at the business clarifying that Muslims would be permitted to use the Gun Range, notwithstanding the sign. Plf. Br. Ex. A, NN Dep. Vol. I, 74:9-12. Mrs. Neal acknowledged that she did not know how someone who is Muslim would determine whether they could enter the business and use the Gun Range in light of the sign at the entryway. *Id*. Vol. I, 111:3-9 ("I don't know how they would find out if they could go in. That's on them.").

52. Disputed in part and incomplete. As the objective evidence, including the recording of Mr. Fatihah's visit, shows, Mr. Fatihah did not engage in confrontational, suspicious, or threatening behavior. *See generally* Plf. Br. Ex. A, NN Dep. Ex. 36; *see also* Ex. M, Suppl. Fatihah Decl. ¶ 4. Plaintiff does not dispute that Mr. Neal informed him that he would not be permitted to use the range until after the "board" reviewed and approved his "paperwork." Plf. SUF ¶ 17. However, Defendants' claim that a board approval process existed was a sham. The board does not have a formal title or name. There are no official Gun Range documents identifying the members of the Gun Range board and no written documentation of their duties. The board does

11

not hold meetings and had never been consulted about a potential customer or member before Mr. Fatihah's visit to the Gun Range, let alone voted on one. Indeed, there are no procedures in place for conducting or recording a vote of the board with respect to any matter. Mrs. Neal makes the final decision as to membership with respect to any particular individual and the board does not have the power to override that decision. Consistent with these practices, or lack thereof, the board never met to discuss Mr. Fatihah's application and never held a vote on it. Plf. SUF ¶¶ 32, 42-47.

53. Undisputed but incomplete. As discussed in paragraph 52, Defendants' claim that they had established a board review and approval process was a sham.

54. Disputed. Rule 10 of Defendants' Gun Range Rules states, "All memberships are subject to board review and approval." The rule does not authorize an investigation or background check, and prior to Mr. Fatihah's visit, Defendants had never conducted a background check on a customer and had no written policy expressly authorizing one. Plf. SUF ¶ 30. Moreover, as discussed above in paragraph 52, the "board review and approval" process referred to in Rule 10 is a sham.

55. Disputed. Defendants did not invoke Rule 10, as evinced by the fact that the board never voted on Mr. Fatihah's membership. Plf. SUF ¶¶ 44-45. After finding out that Mr. Fatihah was a Muslim, Defendants denied him service, consistent with their "no Muslim policy." Plf. SUF ¶¶ 1-6, 12-18; Plf. Br. Ex. D, RF Dep. 74:16-18.

56. Disputed in part. Plaintiff testified that he does not object to Gun Range Rule 10 only "if that's the standard process for everyone who comes to use the range." Plf. Br. Ex. D, RF Dep. 67:3-6.

57. Disputed in part. Defendants may have purported to invoke Gun Range Rule 10, but they did not actually carry it out. The board has never voted on any membership application, including the customer referred to in paragraph 57. Plf. SUF ¶¶ 13, 32, 45; Plf. Br. Ex. A, NN Dep. Vol. II, 38:25-39:6. As set forth in paragraph 52, the "board review and approval" process is a sham.

58. Plaintiff objects to this asserted fact on the ground that Defendants' cited evidence for this statement relies on inadmissible hearsay, including a news article attached to Mrs. Neal's Declaration. Per paragraph 8 above, the Court may not consider it at this stage. Without waiving this objection, this asserted fact is disputed in part and incomplete. Plaintiff does not dispute that the sign was posted after an attack in Tennessee that Defendants believe was carried out by an "Islamic jihadist" who had reportedly trained at a gun range. However, Defendants publicly

discussed deterring Muslims from using the business prior to the Chattanooga attacks. Plf. SUF ¶ 5a.

59. Disputed in part and incomplete. The transcript accurately quotes Mrs. Neal's testimony. Disputed that her testimony regarding the sign was "unequivocal" because it is unclear in what way Defendants believe it to be unequivocal. In discussing the sign and Defendant's policy, Mrs. Neal publicly stated repeatedly that the business would not serve Muslims. *See, e.g.*, Plf. SUF ¶¶ 1-5, 58. She did not post another sign or notice anywhere in the business indicating that the "Muslim free" sign was simply a political protest sign, as Defendants now claim, or that Muslims would be served, notwithstanding the "Muslim free" sign. Plf. Br. Ex. A, NN Dep. Vol. I, 74:5-8.

60. Disputed. The overwhelming evidence shows that Defendants have a policy against serving Muslims and that they prohibited Mr. Fatihah from using the Gun Range because of his Muslim faith. Plf. SUF ¶¶ 1-6, 12-18, 58; Plf. Br. Ex. D, RF Dep. 74:16-18.

61. Undisputed that this is an accurate replication of Plaintiff's testimony (except for the added emphasis).[3]

## ARGUMENT

Defendants' discriminatory sign and policy excluding Muslims from their Gun Range harkens back to the Jim Crow era, a shameful period in American history when segregation and exclusion based on race, ethnicity, religion, and other protected characteristics was not merely tolerated but encouraged and often required. Plf. Br. 26-27. The days when businesses open to the public could discriminate in this manner are long gone, and this Court should decline Defendants' invitation to revive them.

## I.   MR. FATIHAH HAS STANDING.

To establish standing, Mr. Fatihah need only show that: (1) he has suffered an "injury in fact" that is concrete and particularized, as well as actual and not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely the injury will be redressed by the relief requested. *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004). He easily meets each requirement. Mr. Fatihah has produced undisputed evidence of a

---

[3] Summary judgment in Defendants' favor is also precluded by the facts set forth in Plaintiff's Statement of Material Undisputed Facts, at pp. 2-20, of his Memorandum in Support of Motion for Summary Judgment. Plaintiff hereby incorporates those facts into this brief.

particularized and cognizable injury: He visited Defendants' business, was denied service, and was later informed that he is permanently barred from using the Gun Range, even though he would do so again should Defendants or this Court permit it. Plf. SUF ¶¶ 7, 11-18, 28, 33; Ex. M, Suppl. Fatihah Decl. ¶ 6. This injury is directly traceable to the challenged action by Defendants, who made the decision to deny Mr. Fatihah access to their Gun Range. And, Mr. Fatihah's injury would be redressed by the relief requested—an injunction affording him access to the public accommodation. Nothing more is required to demonstrate standing.

In arguing that Mr. Fatihah lacks standing because they did not deny him service based on his faith, but on other grounds, Defendants "confuse[] standing with the merits." *See Initiative & Referendum Inst. v. Walker,* 450 F.3d 1082, 1092 (10th Cir. 2006). As the Tenth Circuit has explained, "[t]he threshold standing inquiry in no way depends on the merits of a plaintiff's contention that the challenged conduct is illegal." *Tandy,* 380 F.3d at 1283 n.10. *Accord In re Special Grand Jury 89-2,* 450 F.3d 1159, 1172 (10th Cir. 2006) ("[A] plaintiff can have standing despite losing on the merits—that is, even though the interest would not be protected by the law in that case."). To require otherwise would "put the merits cart before the standing horse." *See Initiative & Referendum,* 450 F.3d at 1093; *see also United States v. One-Sixth Share of James J. Bulger,* 326 F.3d 36, 41 (1st Cir. 2003) ("Courts should not . . . conflate the constitutional standing inquiry with the merits determination that comes later."). Plaintiff's injury here is the very "sort of interest that the law protects when it is *wrongfully* invaded." *Aurora Loan Servs., Inc. v. Craddieth,* 442 F.3d 1018, 1024 (7th Cir. 2006); *see also id.*("The cases simply require litigants to possess such an interest, which is quite different from requiring them to establish a *meritorious* legal claim.").[4]

---

[4] Defendants assert, without any evidentiary support, that Mr. Fatihah visited the Gun Range "to set up this lawsuit." Defs. Br. 20. In fact, Mr. Fatihah testified otherwise. Plf. SUF ¶ 8. But even if Mr. Fatihah were merely "testing" Defendants' discriminatory policy, it would "not preclude his having standing to sue for invasions of his legal rights." *See Houston v. Marod Supermarkets*, *Inc.*, 733 F.3d 1323, 1332 (11th Cir. 2013) (recognizing standing for "tester" plaintiff in ADA case because the legal right "does not depend on the motive behind Plaintiff Houston's attempt to enjoy the [defendant's] facilities"). After the Supreme Court upheld tester standing under the Fair Housing Act based on its broad statutory language and purpose to eliminate discrimination, *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 373-74 (1982), "[c]ircuit courts have followed[,] . . . hold[ing] that tester standing exists under other anti-discrimination statutory provisions." *Tandy,* 380 F.3d at 1286; *see also, e.g.*, *Jackson v. Motel 6 Multipurpose, Inc.*, 931 F. Supp. 825, 828-29 (M.D. Fla. 1996) (recognizing tester standing in Title II case).

Moreover, contrary to Defendants' unsupported assertion that there is no basis for concluding that Mr. Fatihah will visit the Gun Range again, he has explicitly stated that he intends to do so should Defendants or the Court lift the prohibition currently in place. Plf. Br. Ex. L, Fatihah Decl. ¶¶ 2-3 (explaining that he is looking for an outdoor Gun Range that he can use more regularly that adequately suits his needs); Ex. M, Suppl. Fatihah Decl. ¶ 6 (noting that, if Defendants end their discriminatory policy against him voluntarily, or are ordered to do so by the Court, he will visit the range to purchase a membership as soon as possible thereafter and will frequent the range throughout the year for purposes of recreational shooting). Again, this is more than adequate to establish Mr. Fatihah's standing to seek injunctive relief under Title II. *See, e.g.*, *Jackson v. Waffle House, Inc*., 413 F. Supp. 2d 1338, 1365 (N.D. Ga. 2006) (plaintiff had standing under Title II where he submitted declaration stating "he would return" to the business if it took "significant steps to prevent discriminatory practices by its employees"); *Slocumb v. Waffle House, Inc*., 365 F. Supp. 2d 1332, 1341 (N.D. Ga. 2005) (same); *cf. e.g.*, *Colo. Cross-Disability Coal. v. Abercrombie & Fitch Co*., 765 F.3d 1205, 1211-12 (10th Cir. 2014)  (holding that plaintiff's affirmation, via two affidavits, that she "will likely be going" at least six times per year to mall store with that was allegedly inaccessible to wheelchairs was sufficient basis on which to seek remedial injunction, notwithstanding fact that mall was some distance from her house and the store "not the closest [one] to her home"); *Tandy*, 380 F.3d at 1284 (holding on cross-motions for summary judgment that plaintiff's "averred intent" to use buses with frequently malfunctioning lifts was adequate to confer standing for purposes of prospective relief).

## II.    THE GUN RANGE IS A "PLACE OF ENTERTAINMENT" UNDER TITLE II.

There is no dispute that Defendants' Gun Range is subject to Title II's restrictions. Defendants assert that it does not qualify as a place of entertainment, but, as explained below, the undisputed facts belie that assertion.[5] First, Defendants' argument depends on a narrow and artificial interpretation of Title II that is at odds with the statute's plain language and purpose, as well as the relevant case law. It is well established that Title II "is to be liberally construed and

---

[5] Defendants do not dispute that the Gun Range affects interstate commerce, 42 U.S.C. § 2000a(c)(3), and do not argue that the Gun Range is exempt from Title II as a private club, 42 U.S.C. § 2000a(e). In any event, the undisputed facts, Plf. SUF ¶¶ 13, 30, 32, 34-36, 40-51, 53-57, preclude these arguments. *See, e.g.*, *United States v. Lansdowne Swim Club*, 894 F.2d 83, 85 (3d Cir. 1990); *Durham v. Red Lake Fishing & Hunting Club, Inc.*, 666 F. Supp. 954, 959 (W.D. Tex. 1987).

broadly read," and that Section 2000a(b)(3), in particular, "must be read 'with open minds attuned to the clear and strong purpose of the Act, namely, to secure for all citizens the full enjoyment of facilities . . . open to the general public.'" *See United States v. DeRosier*, 473 F.2d 749, 751–52 (5th Cir. 1973) (quoting *Miller v. Amusement Enters., Inc*., 394 F.2d 342, 349 (5th Cir. 1968) (en banc)); *see also United States v. Baird*, 85 F.3d 450, 453–54 (9th Cir. 1996) (rejecting "the narrower *ejusdem generis* construction of 'place of ... entertainment' in 42 U.S.C. § 2000a(b)(3) which would limit it to places more like 'motion picture house,' etc.").

For purposes of Title II, the Supreme Court has interpreted the word "entertainment" in that very spirit, defining it broadly as "'the act of diverting, amusing, or causing someone's time to pass agreeably,'" and has explained that this includes participation in a "sport or activity." *Daniel v. Paul*, 395 U.S. 298, 306-07 & n.7 (1968) (quoting Webster's Third New International Dictionary, at 757). Under this "generally accepted meaning," *DeRosier*, 473 F.2d at 751, the Gun Range is plainly a place of entertainment. *See, e.g.*, *Target Shooting in America*, National Shooting Sports Foundation, 2 (2013), http://www.nssf.org/PDF/research/TargetShootingInAmerica Report.pdf (reporting that target shooting "provides fun and enjoyment for millions of Americans"). Indeed, as in *Daniel,* the Gun Range "advertises itself as such." 395 U.S. at 306; *see* Plf. SUF ¶¶ 37-39, 50-51 (setting forth numerous instances in which Defendants have promoted the Gun Range's recreational nature). Courts have found that similar businesses qualify as places of public accommodation. *See, e.g.*, *Durham*, 666 F. Supp. 954 (holding that fishing and hunting club was a "place of entertainment" because hunting and fishing are recreational pastimes); *Sayed-Aly v. Tommy Gun, Inc*., 170 F. Supp. 3d 771, 775 (E.D. Pa. 2016) (holding that indoor firearm range qualified as a place of "accommodation, resort or amusement" under Pennsylvania's public-accommodations law); *Doe v. Div. of Youth & Family Servs*., 148 F. Supp. 2d 462, 495-96 (D.N.J. 2001) (noting that the New Jersey Law Against Discrimination lists "shooting gallery" as a place of public accommodation); *Concord Rod & Gun Club, Inc. v. Mass. Comm'n Against Discrimination*, 402 Mass. 716, 718 (1988) (upholding determination that fishing and gun club, which operated trap shooting range and a pistol range on its property, was a "place of public accommodation, resort or amusement" subject to Massachusetts antidiscrimination statute).

Defendants nevertheless argue that their business should be exempt from Title II because it is "principally a retail establishment that sells survival and tactical gear" and because the Gun Range is "foremost an adjunct of a retail establishment." Defs. SUF ¶ 45; Defendants' Brief in

16

Support of Motion to Dismiss and/or for Summary Judgment ("Defs. Br."), ECF No. 67, 13, 15. The undisputed facts show that this is not true. The Gun Range and store are incorporated as one entity and operate on the same property. Nicole Decl. Exs. A, B; Plf. Br. Ex. A, NN Dep. Vol. I, 39:18-40:9 & Ex. O, Add'l NN Dep. Ex. 15.[6] The Gun Range is an integral part of the business, as made clear by the name of the business itself, Defendants' extensive promotion of the Gun Range, and the integrated services provided by the store and the range. Plf. SUF ¶¶ 3-4, 38-39, 50-51, 58. For example, customers must enter the retail store to check in and purchase a daily pass or annual membership to the Gun Range, and to make their way to the Gun Range; the store sells items for use at the range, including paper targets; registers customers for firearm classes; and features a lounge where customers may relax while taking a break from the range or waiting for others who are on the range. Nicole Decl. ¶ 8; Plf. SUF ¶ 11-12, 34, 36, 38. *Cf. United States v. Cent. Carolina Bank & Trust Co*., 431 F.2d 972, 974 (4th Cir. 1970) (holding that golf course and pro shop located on same premises, though technically separate businesses, were "so intertwined

---

[6] Defendants suggest that Plaintiff has no basis for relief because he "has failed to sue the company, Save Yourself Survival and Tactical Gear and Gun Club, LLC[,]" but offer no case law or analysis to support this assertion. Defs. Br. 4. Plaintiff sued Mr. and Mrs. Neal in a d/b/a capacity because, at the time of his suit, the business was not incorporated. Nicole Decl. Ex. B. Putting aside the fact that Defendants did not disclose the incorporation to Plaintiff until *after* the Court's deadline for amending the Complaint, there is no requirement that Plaintiff sue the corporation. Section 2000a-3 of Title II authorizes suit "[w]henever *any person* has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice prohibited by Section 2000a-2," which provides, in turn, that "[n]o person shall . . . withhold, deny, or attempt to withhold or deny, or deprive or attempt to deprive any person of any right or privilege secured by section 2000a." (emphasis added). Both Mr. and Mrs. Neal have deprived Mr. Fatihah of his rights under Section 2000a and are, therefore, proper defendants. *See, e.g*., *Daniel*, 395 at 300–01 (1969) ("The complaint alleged that Lake Nixon Club was a 'public accommodation' subject to the provisions of Title II of the Civil Rights Act of 1964, 78 Stat. 243, 42 U.S.C. § 2000a et seq., and that respondent [the individual who owned and operated the club] violated the Act in refusing petitioners admission solely on racial grounds."); *Smith v. Young Men's Christian Ass'n of Montgomery*, *Inc*., 462 F.2d 634, 649 (5th Cir. 1972) ("Given the Montgomery YMCA's past pattern and practice of racial discrimination abundantly demonstrated on this record . . . the affirmative relief ordered is neither unworkable nor unduly burdensome to the YMCA and the individual defendants."); *DeRosier,* 473 F.2d at 750 (defendants, who were "the owners of The Northwood Bar, a neighborhood bar-tavern," sued with designation of d/b/a Northwood Bar); *Lance v. Plummer*, 353 F.2d 585, 591 (5th Cir. 1965) (enjoining local sheriff from interfering with restaurants' and motels' compliance with Title II and noting injunction of many other individual defendants who had interfered with access to public accommodations). However, if the Court determines otherwise, Plaintiff should be permitted to make a technical amendment to the Complaint to add Defendants' LLC.

in operation that they may properly be considered a single enterprise" that constituted a place of entertainment under Title II).

In any event, under Title II, it "makes no difference whether . . . [the Gun Range is] a substantial or insubstantial part of the store's business." *Baird,* 85 F.3d at 454. Title II "does not require that the entertainment be of a certain variety or that a certain quantum of the establishment's business be derived from the entertainment of its customers." *DeRosier*, 473 F.2d at 752. One court of appeals has held, for example, that a 7-11 convenience store that offered patrons the ability to play two different video games in the store was a place of entertainment. Rejecting the argument that Title II did not apply because the "video games were a peripheral, as opposed to the princip[al] or even a substantial, part of the store's business," the court reasoned that "people play video games in order to amuse themselves and pass the time agreeably," and that "[p]eople go to and remain in stores that have video games, in order to play them." *Baird,* 85 F.3d at 453-54 (pointing out that Congress (1) "directed its attention to the issue of principal and peripheral uses, and required a principal use only" with respect to restaurants, cafeterias, lunch counters, etc., and (2) intended to "integrate entire premises which would not be public accommodations, but for covered establishments on their premises").

Accordingly, even were it not wholly contradicted by the undisputed evidence, Defendants' contention that the Gun Range is merely an "adjunct" to the retail store cannot insulate them from Title II's reach. *See id; see also DeRosier*, 473 F.2d at 751–52 (holding that bar offering patrons a "juke box, shuffle board and pool table for the use and enjoyment of the bar's patrons" fit "quite comfortably" into Title II's "place of entertainment" designation). Nor are Defendants exempt from Title II on the ground that the Gun Range may have other purposes *in addition* to, or even more "central" than, *see* Defs. Br. 15, the recreational functions that Defendants have prominently advertised. *See Rousseve v. Shape Spa for Health & Beauty, Inc*., 516 F.2d 64, 68 (5th Cir. 1975) ("While we do not doubt that appellees have properly characterized one of the purposes of their health and exercise program, we are convinced that there are sufficient entertainment and recreational aspects of the programs offered to permit the studios to be termed 'place(s) of entertainment.'"). Target shooting is unquestionably a recreational sport or hobby, and Defendants

have repeatedly held out their Gun Range as a place where members of the general public can enjoy themselves by engaging in this form of entertainment.[7]

Defendants cite no case law to the contrary. *Denny v. Elizabeth Arden Salons, Inc.*, 456 F.3d 427 (4th Cir. 2006), for instance, Defs. Br. 14-15, is unavailing. Like hunting clubs, golf courses, and roller rinks, Defendants' Gun Range is a venue '"where entertainment takes the form of direct participation in some sport or activity."' *Id.* at 432 (quoting *Daniel*, 395 U.S. at 306.) As the Fourth Circuit recognized, this is the very sort of establishment covered by Title II. *Id.* A hair salon does not share this characteristic. *Id.*

Defendants also argue that Title II does not apply to their business because there is no history of discrimination at "retail stores that include gun ranges." Defs. Br. 14. But even assuming that is true, Section 2000a(b)(3) applies to *any* place of "exhibition or entertainment." There is no carve-out within that category based on whether particular places of entertainment have a history of discrimination. By Defendants' logic, a laser tag or paintball business would be exempt from Title II despite being a place of amusement: There is no history of discrimination when the Civil Right Act of 1964 was passed because such venues did not exist. *See, e.g.*, Cheryl Hall, *Who Knew? Laser Tag Was Invented in Dallas*, Dallas Morning News (May 14, 2014), https://www.dallasnews.com/business/business/2014/05/06/who-knew-laser-tag-was-invented-in-dallas (laser tag invented in 1984); Dashka Slater, *Who Made That Paintball?* N.Y. Times (Aug. 15, 2014), https://www.nytimes.com/2014/08/17/magazine/who-made-that-paintball.html (paintball invented in 1981). Defendants must comply with federal public-accommodations law.

---

[7] At the same time that they argue the Gun Range is *not* a place of entertainment under federal public-accommodations law, Defendants take the position that the range *is* a place of entertainment for purposes of state antidiscrimination law, which expressly omits "amusement establishments" from its purview. Defs. Br. 14-15 n. 7 & n.8 (citing Okla. Stat. tit. 25 § 1401). Plaintiff agrees with Defendants that their Gun Range is an amusement establishment under state law and is thus not covered under the Oklahoma public-accommodations statute; to that end, Plaintiff concedes that his state-law claim—pled as an alternative to his Title II claim—may be dismissed by the Court. *But Defendants cannot have their cake and eat it, too.* Defendants cite no authority to support their assertion that an "amusement establishment" under Oklahoma law would not also qualify as a "place of entertainment" under federal law. Plaintiff is aware of none. On the contrary, as discussed above, the U.S. Supreme Court has expressly stated that the word "entertainment," as used in Title II, includes "the act of . . . amusing[.]" *Daniel*, 395 U.S. at 306-07 & n.7. In admitting that their Gun Range is an amusement establishment under state law, Defendants have effectively acknowledged that Title II applies to their business.

## III.   IT IS PLAINTIFF, NOT DEFENDANTS, WHO IS ENTITLED TO SUMMARY JUDGMENT.

Title II "was designed to redress the very type of circumstances presented" by Defendants' discriminatory treatment of Mr. Fatihah. *See CAIR Florida, Inc. v. Teotwawki Investments*, *LLC*, No. 15-CV-61541, 2015 WL 11198249, at *3 n.2 (S.D. Fla. Nov. 24, 2015) (gun store owner had declared his business a "Muslim Free Zone"). Plaintiff has produced voluminous, direct, and unrebutted evidence that Defendants discriminated against Mr. Fatihah because he is Muslim. This evidence is not only sufficient to defeat Defendants' summary judgment motion, but it entitles Plaintiff to summary judgment on his Title II claim. In light of the direct evidence of discrimination adduced by Plaintiff, in order to avoid liability, Defendants must prove by a preponderance of the evidence that they would have denied Mr. Fatihah "even in the absence of the[ir] impermissible motivation." *See Long v. Laramie Cty. Cmty. Coll. Dist.*, 840 F.2d 743, 748–49 (10th Cir. 1988). They cannot meet this burden. As explained in Plaintiff's motion for summary judgment and below, no rational factfinder could find in Defendants' favor based on the record at hand. *See id;* Plf. Br. at 28-31.

### A.   Defendants Apply the Wrong Legal Standard to the Discrimination Analysis.

Defendants ask the Court to apply the wrong legal standard to Mr. Fatihah's discrimination claim. When a court "finds that discrimination has been established by the plaintiff's direct evidence," the three-part burden-shifting analysis for circumstantial evidence, established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), does not apply. *See Long*, 840 F.2d at 748–49; Defs. Br. 17-18 (setting forth the *McDonnell Douglas* test).[8] In cases like this one, Defendants must do much more than merely articulate a "legitimate nondiscriminatory reason" for their actions; they must "prove *by a preponderance of the evidence* that the . . . [challenged] action would have been taken even in the absence of the impermissible motivation." *Id.* (emphasis added); *see also E.E.O.C. v. Alton Packaging Corp.*, 901 F.2d 920, 925 (11th Cir. 1990) (holding

---

[8]  Having insisted that the Court apply the wrong legal standard to Plaintiff's claim, Defendants go on to mangle what that standard requires. In this individual discrimination case, Defendants contend that Plaintiff must satisfy the proof requirements of a pattern or practice claim—that is, "'prove more than the mere occurrence of isolated or 'accidental or sporadic discriminatory acts.'" Defs.' Br. 17 (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977)). However, *Teamsters* concerned a defendant who was charged with maintaining a "systemwide pattern or practice of resistance to the full enjoyment of Title VII rights." 421 U.S. at 336. Because Plaintiff makes no such allegation here, *Teamsters* is inapposite.

in racial discrimination case that "[p]roduction of nondiscriminatory reasons is not enough in a direct evidence case; the defendant must prove that there was a separate, racially-neutral reason for its failure to promote the plaintiff"); *Perry v. Kunz*, 878 F.2d 1056, 1059 (8th Cir. 1989) ("'The plaintiff's proof by means of direct evidence of discrimination does not merely fulfill his burden of showing a prima facie case; it suffices to make his entire case and throws the burden on the defendant of proving, at least by a preponderance of the evidence . . . that it would have rejected the plaintiff even in the absence of discrimination.'") (quoting 2 Larson, Employment Discrimination, § 50.62 at pp. 10–67 to 10–68 (1988)).[9]

As explained in Plaintiff's motion for summary judgment, Plf. Br. 24-27, there is ample direct evidence of Defendants' discrimination. First, in a move straight out of the Jim Crow era, Defendants posted a sign at the entrance of their business, plainly announcing their discriminatory policy against Muslims. They posted a similar notice on the business's public Facebook page, and gave multiple interviews to the media, making clear that they would not serve Muslims. *See* Plf. SUF ¶¶ 1-2, 4; *see also* Plf. SUF ¶ 3 (referring to "our no Muslim policy"); Plf. Br. Ex. A, NN Dep. Vol. II, 157:5-13 & Ex. O, Add'l NN Dep. Ex. 70 (posting about their sign on the business's Facebook page, "Google us…it's going viral folks!").[10] They have labeled Muslims terrorists, "muzrats," and "towel heads." Plf. SUF ¶¶ 2, 3, 5, 26. When Mr. Fatihah entered the business on October 23, 2015, Defendants excluded him from the range only after he disclosed his religion. Plf. SUF ¶¶ 11-18, 26-28. Defendants told Mr. Fatihah that his paperwork would have to be submitted to the "board" for approval before he could use the range—a requirement they had never previously imposed on any customer and one that they did not (and indeed, could not) carry out because the purported board review and approval process is a sham. *Supra* ¶ 52; Plf. SUF ¶¶ 13,

---

[9] Because there is "scant case law under Title II" of the Civil Rights Act of 1964, "courts faced with a Title II case frequently borrow Title VII authority" in analyzing evidence of discrimination for summary judgment purposes. *See Fahim v. Marriott Hotel Servs., Inc.*, 551 F.3d 344, 349 (5th Cir. 2008) (applying Title VII case law to Title II racial discrimination claim).

[10] Defendants point out that they posted a single contradictory statement on Facebook, but the statement was never posted on the business's Facebook page. Moreover, Defendants continued to affirm publicly their "no Muslim policy" thereafter, and they continued to display their discriminatory sign at the business, without providing any indication that Muslims would be served notwithstanding their blatantly discriminatory warning. *See supra* ¶ 51. This does not even begin to negate the overwhelming evidence of intentional discrimination against Muslims and Mr. Fatihah.

17, 29-30, 32, 42-47, 50. The next day, in recounting Mr. Fatihah's visit to another gun store owner who has also banned Muslims, Mr. Neal slurred him as a "muzrat," Plf. SUF ¶ 26; and eight months later, after this lawsuit was filed, Mrs. Neal continued to boast publicly that she owns the "only Muslim free gun range in Oklahoma." Plf. SUF ¶ 58.

Such extensive, overt direct evidence is more than sufficient to establish that Defendants were motivated by an intent to discriminate against Mr. Fatihah because of his faith. *See* Plf. Br. at 24-25, 27 (citing cases in which analogous evidence was recognized as "direct" for purposes of the discrimination analysis); *see also Dysart v. Palms of Pasadena Hosp.*, 89 F. Supp. 3d 1311, 1318-19 (M.D. Fla. 2015) (holding, in case where hospital catered to patient's demand that "no blacks" treat her, that a sign posted on the patient's door directed personnel to the nurse's station, where they were screened "by a white charge nurse for acceptable race and skin color before they could enter the hospital room," was direct evidence of discrimination). Defendants now bear the burden of "rebut[ting] the direct evidence by proving that [they] would have made the same decision even if [they] had not taken [religion] into account." *See id.* at 1320. As discussed in Plaintiff's summary judgment brief, Defendants have not met this burden because they cannot show, by a preponderance of the evidence, that they would have taken the same adverse action toward Mr. Fatihah if he were not Muslim.

### B. Defendants Have Not Adduced Evidence Sufficient to Meet Their Burden Under the Direct Evidence Standard.

Defendants' attempt to explain away their discriminatory policy and treatment of Mr. Fatihah only further illuminates their anti-Muslim animus. They point, for instance, to Mr. Fatihah's service on the board of CAIR-Oklahoma as a reason they denied his membership and will not allow him to use the Gun Range in the future. Defs. Br. 4; Nicole Decl. ¶ 42. But this post-hoc justification fails for several reasons, including—first and foremost—that it is nothing more than a thinly veiled attempt to get at Mr. Fatihah's religion by using his association with a Muslim civil-rights organizations as a proxy for his faith.

First, Defendants' suggestion that CAIR-Oklahoma is a terrorist organization or a "front" for terrorist groups—and thus, that Mr. Fatihah or anyone associated with CAIR-Oklahoma is a public safety threat—rests on the same conspiracy theories, anti-Muslim bigotry, and inadmissible

evidence as their spurious accusations against CAIR-National.[11] It is implausible, preposterous, and offensive. Mr. Fatihah has no criminal history. Plf. SUF ¶ 24. His board membership with CAIR-Oklahoma has not precluded him from serving in the Army Reserve or working for the State of Oklahoma, Plf. SUF ¶ 6, and for good reason: Neither CAIR nor CAIR-Oklahoma has ever been charged with or convicted of any criminal wrongdoing. *Supra* ¶¶ 14, 16, 18. Defendants have produced no evidence to dispute this fact. If Defendants nevertheless truly believed that CAIR-Oklahoma has terrorist ties, their recourse would have (and should have) been to notify law enforcement. They did not do so because they knew that law enforcement would reject their wild-eyed accusations.

      For instance, Mrs. Neal concedes that, in 2015, then-Secretary of State John Kerry wrote a letter to Nihad Awad firmly rejecting the United Arab Emirates designation that Defendants keep touting. Nicole Decl. ¶ 44. The letter stated that "the U.S. government clearly does not consider CAIR to be a terrorist organization" and "rejected this allegation immediately," and that the government was working to reverse it. Plf. Br. Ex. A, NN. Dep. Ex. 38. But Mrs. Neal dismisses the letter as "politically motivated" and asserts that "Kerry's judgment and credibility are certainly questionable" in light of statements he purportedly made about Syria and chemical weapons. Nicole Decl. ¶ 44. *But see* Plf. Br. Ex. A. NN Dep. Vol. II, 108:1-10 (QUESTION: "[A]re you better qualified or better equipped than the State Department of the United States of America to determine whether CAIR is a terrorist organization?" ANSWER: "I don't know."). In another

---

[11] Defendants' contention that CAIR-National is a terrorist organization or a "front group" for the Muslim Brotherhood or Hamas is a house of cards that collapses under a breath of common sense. If CAIR were a terrorist organization or had unlawful ties to terrorist organizations, it is extremely unlikely that the U.S. government would have allowed the group to continue operating for more than two decades without any prosecution. Aware of the illogic of their argument, Defendants nevertheless attempt to stir up unsubstantiated conspiracy theories by relying on irrelevant and inadmissible hearsay (in the form of trial transcripts and exhibits from a decade-old case), *supra* ¶¶ 8, 11, 12, 14-17, 20, 50, as well as an irrelevant and non-binding Louisiana House Resolution that not only acknowledges that the Justice Department has not made any "determination that CAIR has been involved in or supported any terrorist activity," *supra* ¶¶ 18-19, but is also riddled with inaccuracies and half-truths and was championed by the Center for Security Policy ("CSP"). Ex. N, Frankel Rep. ¶¶ 76-89. CSP is an anti-Muslim group "[k]nown for its accusations that a shadowy 'Muslim Brotherhood' has infiltrated all levels of government and warnings that 'creeping Shariah,' or Islamic religious law, is a threat to American democracy." Center for Security Policy, Southern Poverty Law Center, https://www.splcenter.org/fighting-hate/extremist-files/group/center-security-policy (last visited May 12, 2017).

similar example, this time more local, Defendants suggested that the police were ignoring a nearby terrorist camp. After declaring (incorrectly) that the "[n]ational headquarters for CAIR is in Oklahoma City," Mr. Neal explained: "Somebody try to tell me, somebody try to say that there's not a big Muslim population in Oklahoma. We have reports from the locals here that down the road there is Muslim presence, down one of the dirt roads and there they've got some kind of camp going, because there's explosions off into one of the sides of the mountain, that they're building caves or something. . . . They've been investigated but the cops said there's nothing down there." Plf. Br. Ex. A, NN Dep. Ex. 50B at 06:35-07:11); *id.* (Mrs. Neal interjecting that the local Muslims are setting off explosions "into the hills" and are "building underground").

As indicated by its name, CAIR-Oklahoma is an Islamic civil liberties and civil rights organization that directly serves the Muslim community in Oklahoma. *Supra* ¶ 6; Plf. SUF ¶ 21. All of CAIR-Oklahoma's board members are Muslim, and the overwhelming majority of individuals who take part in CAIR-Oklahoma's volunteer efforts are Muslim. Ex. M, Suppl. Fatihah Decl. ¶ 3. Defendants' animus against CAIR-Oklahoma (and CAIR-National) cannot be separated from the organizations' Muslim-centric mission or Defendants' well-demonstrated prejudice against Muslims. *See, e.g.*, Plf. SUF ¶ 26 (Mr. Neal describing Mr. Fatihah as a "muzrat from CAIR.").

Imposing a criterion—here, association with CAIR—that is merely a substitute for Mr. Fatihah's faith is itself discriminatory and cannot evade a finding of discrimination in the face of the overwhelming, direct evidence here. *See, e.g.*, *McWright v. Alexander,* 982 F.2d 222, 228 (7th Cir. 1992) ("We have warned that an employer cannot be permitted to use a technically neutral classification as a proxy to evade the prohibition of intentional discrimination."); *Dysart*, 89 F. Supp. 3d at 1319 (holding in direct evidence case that "there is no legitimate, discriminatory reason defense recognized by law . . . in an intentional discrimination" claim).[12] Indeed, Defendants' post-hoc CAIR rationalization would not even meet their burden under the more deferential circumstantial-evidence standard, which requires them to identify a legitimate, *non-discriminatory*

---

[12] Defendants' assertion that they prohibit all CAIR staff, regardless of faith, from the Gun Range does not give them legal cover to use membership in CAIR as a way to enforce their "no Muslim policy." *See McWright,* 982 F.2d at 228 (noting that "using gray hair as a proxy for age" would be prohibited even though "there are young people with gray hair" because the "'fit' between age and gray hair is sufficiently close that they would form the same basis for invidious classification").

reason for denial of service. *See id.* (noting that only a "legitimate, *non-*discriminatory reason would be a defense" even under the *McDonnell Douglas* standard) (emphasis in original); *cf. Hilde v. City of Eveleth*, 777 F.3d 998, 1006-07 (8th Cir. 2015) (holding that city's assumption that police officer "was uncommitted to a position because his age made him retirement-eligible [was] age-stereotyping" and not a legitimate, non-discriminatory reason for a failure to promote); *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 431 (2d Cir. 1995) (affirming jury finding against local leaders in Fair Housing Act case that challenged restrictions on use of Orthodox rabbis' homes for prayer services, where defendants' supposed evidence of legitimate non-discriminatory reason showed overt "animosity toward Orthodox Jews as a group").[13]

Second, even were it not an obvious effort to target Mr. Fatihah because of his Muslim faith, Defendants are not saved here by their excuse that, as a "public safety" matter, they prohibit access to the Gun Range by members of organizations with purportedly terrorist ties. This proffered explanation is so rife with "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions," *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1218 (10th Cir. 2013), that no reasonable trier of fact could find in Defendants' favor under the more deferential circumstantial-evidence standard let alone under the direct evidence framework applicable here, where they bear the burdens of production and persuasion.

Defendants had *no idea* that Mr. Fatihah was a board member of CAIR-Oklahoma until *after* they denied him service on October 23, 2015. Plf. SUF ¶ 20. Moreover, prior to Mr. Fatihah's visit, Defendants *had not once* ever conducted a background check or demanded that customers reveal with what civic or charitable organizations they associate. Plf. SUF ¶¶ 30-31 And—notwithstanding Gun Range Rule 11, which was not codified or displayed anywhere in the business until after Mr. Fatihah filed suit—Defendants still do not take any steps to determine whether the

---

[13] Even if the Court were to apply the *McDonnell Douglas* standard here, Plaintiff would still be entitled to summary judgment. He has shown (1) he is Muslim; (2) he attempted to access a public accommodation; (3) he was denied that access by Defendants; and (4) access was made available to customers who were non-Muslim. *See Fahim*, 551 F.3d at 350. And, as discussed herein, the overwhelming evidence of Defendants' anti-Muslim policy and prejudice—combined with the gaps and inconsistencies in their justifications (at least one of which is discriminatory itself) for denying Plaintiff service—easily demonstrate pretext. *See Tabor*, 703 F.3d at 1218 (holding that pretext can be demonstrated by showing that "discrimination was a primary factor" in the challenged decision, including by revealing weaknesses and flaws in the defendant's explanation such that a reasonable fact finder could deem it unworthy of credence).

rest of their customers meet the "public safety" requirements of Rule 11 that Mr. Fatihah purportedly fails. Plf. SUF ¶¶ 53-57.

Finally, even if the focus on CAIR somehow could theoretically shield Defendants from liability, it bears repeating that Defendants proudly declare in physical signage and online that their business is a "Muslim free establishment"—not a "CAIR free" one.

Defendants also assert that they denied Mr. Fatihah service because he allegedly posed a safety threat during his visit to the range. But this too is belied by countless "inconsistencies weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions," *Tabor*, 703 F.3d at 1218, that would make it impossible for a reasonable factfinder to rule in Defendants' favor under the circumstantial evidence framework, much less under the direct-evidence standard they must meet here. For example, Defendants say they were suspicious of Mr. Fatihah because it had been raining the night before he arrived at the range. Yet, they admit that on the morning of his visit there was "just a drizzle" and that they often "encourage people to show up at [the range] when it is raining." Nicole Decl. ¶ 31; Plf. SUF ¶ 10. They say they were suspicious of Mr. Fatihah because of the clothing he was wearing, but Mrs. Neal essentially complimented him on his attire during his visit, observing (after he disclosed that he was Muslim) that he "came dressed as an American," as opposed to wearing "[Muslim] garb." Plf. SUF ¶ 12 & n.5. And, she admitted at her deposition that what Mr. Fatihah was wearing was not any different from what Mr. Neal himself wears on the range. *Id.*; Plf. Br. Ex. A, NN Dep. Vol. I, 52:11-54:8, 57:9-19. Defendants say Mr. Fatihah was suspect because he forgot his ear and eye protection, but they routinely sell those items and more (including ammunition) for customers to use on the Gun Range. Plf. SUF ¶ 34; Plf. Br. Ex. A, NN Dep. Vol. I, 19:10-19. Immediately after Mr. Fatihah filed suit, Defendants publicly affirmed their attorney's claim that Mr. Fatihah had entered the premises with an AK-47 slung over his shoulder with the magazine inserted. Plf. SUF ¶ 19 n.6. But after attending Mr. Fatihah's deposition, and hearing him testify that he owns an AR-15 but not an AK-47, Defendants (who are gun experts) suddenly changed their story, testifying that they were unsure what type of rifle Mr. Fatihah had, but that it was either an AR-15 or AK-47, or some type of military rifle. *Id.* Mrs. Neal's story on this point has evolved again: Defendants claimed in discovery that his rifle *was* loaded; now Mrs. Neal has backed off of that claim and states that it "appeared" to her, at one point, that the rifle was loaded. *Supra* ¶ 37. Not once during Mr. Fatihah's visit did Defendants ever suggest that he was violating any Gun Range rules. Plf. SUF ¶ 19.

That is not all: There are even more inconsistencies and claims that simply do not add up. Mrs. Neal now says, for the first time, that she immediately recognized Mr. Fatihah's last name as a "Muslim name"—whatever that means—and was going to let him use the range anyway; yet, when Mr. Fatihah disclosed he was a Muslim, she responded with surprise, asking, "You're Muslim?" Plf. SUF ¶ 12. Defendants have stated that Mr. Fatihah proclaimed himself "sharia-adherent" out of the blue, but in fact, it was Mrs. Neal who brought up Sharia first. Plf. Br. Ex. G, Defs.' Resp. Pl.'s Interrog. No. 1 at 6-7; Plf. SUF ¶ 14. Mrs. Neal also says that Mr. Fatihah "took a threatening stance at the time he was declaring he was a Muslim," purportedly stepping back with his right foot and reaching toward his rifle with his right hand. Nicole Decl. ¶ 39; Plf. Br. Ex. A, NN Dep. Vol. II, 69:11-13. Yet, she admits she never saw him touch the rifle and does not contend that he actually grabbed it or attempted to point it in her direction at any time during his visit. Plf. Br. Ex. A, NN Dep. Vol. II, 69:19-70:10. Because he did not. Ex. M, Suppl. Fatihah Decl. ¶ 4. Indeed, in the moments immediately after Mr. Fatihah purportedly took a threatening stance, Mrs. Neal told him she believed he was not "[t]here to cause anybody any trouble." Plf. SUF ¶ 14. Moreover, despite the purportedly "threatening stance," both she and Mr. Neal continued to engage Mr. Fatihah in discussion about his faith and religious beliefs, demanding that he admit to their claim that Islam requires him to "kill infidels." Plf. SUF ¶¶ 14-16. As the audio recording evinces, Mr. Fatihah remained calm and polite the entire time, and disavowed any religious beliefs that would advocate for violence or imposing Islam on others. *Id.*; *see generally* Plf. Br. Ex. A, NN Dep. Ex. 36. When Defendants told him he could not use the range that day, he left without incident, even wishing Defendants a "good day." Plf. SUF ¶ 18. Though Defendants told Mr. Fatihah that the board would have to decide whether to approve his membership, no board ever held a meeting about it or voted on it. Plf. SUF ¶ 32.

Finally, despite claiming that they feared for their lives during Mr. Fatihah's visit to the business, Plf. Br. Ex. B, CN Dep. 44:22-23, and having no other memberships pending "board approval" when Mr. Fatihah called to check whether he could use the Gun Range weeks later, Mrs. Neal did not even recall who he was. Plf. SUF ¶ 27. She asked him to spell his name and said she would call him back, though she never did. *Id.* Throughout this entire time, Defendants never called law enforcement—not when Mr. Fatihah was at the range or after he left, and not even after they discovered that he was associated with a group they claim is a terrorist organization and "front group" for Hamas. Plf. SUF ¶ 25.

On this record, Defendants surely have not demonstrated that they are entitled to summary judgment on Plaintiff's Title II claim; nor have they "marshal[led] sufficient evidence" to avoid summary judgment in Plaintiff's favor. *See Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1306 (10th Cir. 2017) (internal quotation marks omitted); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) (holding that summary judgment should have been granted to defendant where evidence of plaintiff's reckless driving "so utterly discredited" his version of events that "no reasonable jury could have believed him").

## C.   The First Amendment Does Not Shield Defendants From Liability.

Defendants contend that their "Muslim free" sign is protected "public issue speech." Defs. Br. 16-17. The Supreme Court disagrees. The Court has used the example of a discriminatory sign as *the* paradigmatic example of conduct that civil rights laws may prohibit consistent with the First Amendment. *See Rumsfeld v. Forum for Acad. and Institutional Rights, Inc.*, 547 U.S. 47, 62 (2006) ("Congress, for example, can prohibit employers from discriminating in hiring on the basis of race.  The fact that this will require an employer to take down a sign reading 'White Applicants Only' hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct.").

Defendants' liability here rests on their discriminatory conduct. As Plaintiff explains in his Memorandum in Support of Motion for Summary Judgment, a defendant's speech often plays a central role in the discrimination analysis because it is usually an integral part of the illegal discriminatory conduct or, at a minimum, consideration of the speech is necessary to elucidate the defendant's discriminatory animus. *Cf., e.g.*, *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365 (1977) ("If an employer should announce his policy of discrimination by a sign reading 'Whites Only' on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs."). There is nothing improper or unconstitutional about considering a defendant's speech as part of a discrimination case, and courts routinely consider evidence of written and oral statements made by defendants in such cases. Plf. Br. 23-29.

The cases cited by Defendants do not hold otherwise. In *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 920 (1982), Defs. Br. 17, the Supreme Court concluded that a boycott launched by the NAACP in Mississippi was protected First Amendment activity and rejected an effort to impose civil liability on some NAACP members because other members had committed acts of

violence during the protest. The Court explained: "To impose liability . . . would—ironically—not even constitute 'guilt by association,' since there is no evidence that the association possessed unlawful aims. Rather, liability could only be imposed on a 'guilt for association' theory. Neither is permissible under the First Amendment." *Id.* at 925. But there was no suggestion in *Claiborne* that the individual protestors who "engage[d] in illegal acts and . . . conspire[d] to violate the law" could not be held civilly liable for their actions. *See United States v. Wilson*, 154 F.3d 658, 666 (7th Cir. 1998). *Snyder v. Phelps*, 562 U.S. 443 (2011), Defs. Br 16-17, is equally unavailing. *Snyder* involved a state tort claim, not a discrimination claim. *Id.* at 450. While the First Amendment is not a defense to a discrimination claim, it may serve as a defense to a tort claim. *Id.* at 451.

Defendants' discriminatory sign and other written and oral comments are direct evidence of the very type of conduct that Title II prohibits: a discriminatory refusal to offer service on the basis of religion. Indeed, they are integral to Defendants' unlawful conduct here because they are the *vehicles* through which Defendants both communicate the business's discriminatory policy to the public *and* enforce it. *See* Plf. SUF ¶ 4f (Mrs. Neal explaining that Defendants put up their sign to "give them [Muslims] forewarning so they don't have to come in here and I have to tell them to go away"); Plf. SUF ¶ 1-5, 38, 58. Accordingly, Defendants have no free speech defense. *See Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949) ("[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.").

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' Motion to Dismiss and/or for Summary Judgment and grant Plaintiff's Motion for Summary Judgment as to his Title II claim.

/s/ *Brady R. Henderson*
Brady R. Henderson, OBA#21212
American Civil Liberties Union of
Oklahoma Foundation
3000 Paseo Drive
Oklahoma City, OK 73103
(405) 524-8511, (405) 525-2296 (fax)
Email: bhenderson@acluok.org

Veronica Laizure, OBA #32040
Council on American Islamic Relations of
Oklahoma
3000 United Founders Blvd., Suite 226
Oklahoma City, OK 73112
(405) 415-6815, (405) 526-0461 (fax)
Email: vLaizure@cair.com

Daniel Mach* - DC Bar #461652
Heather L. Weaver* - DC Bar #495582
American Civil Liberties Union Foundation
915 15th St., NW Ste. 600
Washington, DC 20005
(202) 675-2330, (202) 546-0738 (fax)
Email: dmach@aclu.org
hweaver@aclu.org

Lindsay C. Harrison* - DC Bar #977407
Jenner & Block LLP
1099 New York Ave NW
Suite 900
Washington, DC 20001
(202) 639-6865
Email: lharrison@jenner.com

*Admitted *pro hac vice*

*Attorneys for Plaintiff*

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on May 12, 2017, I filed the foregoing document and supporting exhibits with the Clerk of the Court using the CM/ECF system, through which Defendants' counsel will be notified of the filing.

/s/ *Brady R. Henderson*

Brady R. Henderson
*Attorney for Plaintiff*